# IN THE SUPREME COURT OF TEXAS

════════════
No. 11-0425
════════════

PETROLEUM SOLUTIONS, INC., PETITIONER,

v.

BILL HEAD D/B/A BILL HEAD ENTERPRISES AND TITEFLEX, INC., RESPONDENTS

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued December 4, 2012**

JUSTICE LEHRMANN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE GUZMAN, JUSTICE DEVINE, and JUSTICE BROWN joined, and in Parts I and II of which JUSTICE BOYD joined.

JUSTICE BOYD delivered an opinion dissenting in part.

We deny the motions for rehearing of Bill Head d/b/a Bill Head Enterprises and Petroleum Solutions, Inc. We withdraw our opinion of July 11, 2014, and substitute the following in its place.

Bill Head, doing business as Bill Head Enterprises (Head), hired Petroleum Solutions, Inc. to manufacture and install an underground fuel system. Following a large diesel leak, Head sued Petroleum Solutions for its resulting damages, and the trial court rendered judgment on the jury's verdict in Head's favor. The trial court also rendered judgment in favor of third-party defendant Titeflex, Inc., the alleged manufacturer of a component part incorporated into the fuel system, on

Titeflex's counterclaim against Petroleum Solutions for statutory indemnity. The court of appeals affirmed the judgment. Petroleum Solutions presents two principal issues for our review. First, Petroleum Solutions challenges the trial court's issuance of spoliation sanctions against it, which included submitting a spoliation instruction to the jury and striking Petroleum Solutions' statute-of-limitations and statutory-indemnity defenses. Second, Petroleum Solutions complains that Titeflex's statutory-indemnity claim fails as a matter of law.

We hold that the trial court abused its discretion by charging the jury with a spoliation instruction and striking Petroleum Solutions' defenses because those sanctions do not conform to the standards set forth in our recent decision in *Brookshire Brothers, Ltd. v. Aldridge*, 438 S.W.3d 9 (Tex. 2014). Because the trial court's abuse of discretion was harmful with respect to the claims between Head and Petroleum Solutions, we reverse the court of appeals' judgment as to Head's claims and remand to the trial court for further proceedings between those parties. However, we agree with the trial court and the court of appeals that Titeflex was entitled to statutory indemnity from Petroleum Solutions and hold that any spoliation error with respect to the indemnity claim was harmless. Therefore, we affirm the court of appeals' judgment as to Titeflex's indemnity claim.

## I. Factual and Procedural Background

Head owns and operates the Silver Spur Truck Stop in Pharr, Texas. Head contracted with Petroleum Solutions to install a diesel-fuel storage system that included pipes necessary to transport the fuel from the tanks to the station's fuel pumps. The parties agree that flex connectors—parts of the piping system—were components of the new fuel system. However, they disagree about who manufactured the connectors that Petroleum Solutions used in the system.

2

After installing the fuel system, Petroleum Solutions recommended installing an automatic tank-gauging system to detect any fuel releases. Head agreed, and Petroleum Solutions completed the system's installation in October 1999. Shortly after both the fuel and gauging systems were installed, Head began to experience problems, mainly with the gauging system, and requested maintenance and repair work from Petroleum Solutions on numerous occasions. In November 2001, Head contacted Petroleum Solutions about fluctuations in the fuel inventory data from the gauging system. Petroleum Solutions investigated and discovered that a major diesel-fuel release had occurred. The Texas Natural Resource Conservation Commission (now the Texas Commission on Environmental Quality) recorded a recovery of approximately 20,000 gallons of diesel fuel from the surrounding ground.

Petroleum Solutions workers immediately notified Head and Petroleum Solutions' president, Mark Barron, about the leak, and Barron traveled to the Silver Spur to help determine the cause. After testing, Petroleum Solutions concluded that the leak originated in the piping that ran from the tanks to the fuel dispensers. Barron subsequently informed the Silver Spur's general manager, Robert Carpenter, that the source of the leak was a faulty flex connector located under "Dispenser Number 4." Barron showed Carpenter the allegedly faulty connector and asked if Petroleum Solutions could retain it for safekeeping and possible testing. Carpenter agreed to Barron's request. That was the last time Carpenter or Head saw the flex connector. Petroleum Solutions would later say that Titeflex had manufactured the flex connector, but photos of the connector did not reveal the manufacturer, and Petroleum Solutions was unable to produce records showing that Titeflex was the manufacturer.

3

Petroleum Solutions reported the incident to its liability insurer, which engaged attorney Elizabeth Neally to represent Petroleum Solutions. In February 2002, Barron gave the flex connector to Neally, who sent it to metallurgist David Hendrix for evaluation along with instructions not to perform destructive testing. Hendrix performed an unspecified analysis on the component, then processed it into inventory for storage at WH Laboratories. In April 2002, Neally sent Hendrix a letter inquiring about his review and inspection of the flex connector, and Hendrix responded with an invoice for his professional engineering services, which included photographing the flex connector, four hours of professional time, and one hour of laboratory time. Petroleum Solutions did not contact Hendrix again or otherwise inquire about the connector until March 2006, shortly after Head filed suit. By that time, the storage facility at WH Laboratories had been demolished, and certain contents of the building had been discarded or destroyed in conjunction with the building's demolition. Howard Heinsohn, the lab's manager, testified at a deposition that he orally advised Hendrix that the building would be torn down and its contents destroyed, and that Hendrix retrieved some items and told Heinsohn he could throw out the rest. However, nothing in the record suggests Petroleum Solutions was informed that WH Laboratories would be torn down or even knew that the connector was being stored there.

Beginning in December 2001, Head withheld payments from Petroleum Solutions, which it blamed for causing the leak. In May 2002, Head's attorney wrote a letter to Petroleum Solutions threatening suit. While the letter requested that Petroleum Solutions contact Head to resolve their dispute amicably, the letter did not request production of the flex connector. Head eventually filed suit against Petroleum Solutions on February 13, 2006, asserting claims for breach of the warranty

of fitness, breach of the implied warranty of good and workmanlike services, and negligence.[1] Because the lawsuit was filed more than four years after the leak was discovered, Head also pleaded the discovery-rule and fraudulent-concealment exceptions to the statute of limitations. Petroleum Solutions answered, asserting limitations and other affirmative defenses. It also alleged that Titeflex had manufactured the missing flex connector that caused the leak.

Petroleum Solutions then filed a third-party petition against Titeflex, claiming indemnity and contribution based on a products-liability theory. Head followed in Petroleum Solutions' footsteps and amended its petition to assert a strict products-liability claim directly against Titeflex. The amended petition attributed the leak and the resulting damages to several deficiencies, including: a failure of the line leak detector and gauging system; the faulty flex connector, which was "part of the [fuel] system" and which Titeflex allegedly sold to Petroleum Solutions; and Petroleum Solutions' failure to properly install or repair the fuel and gauging systems.

Titeflex moved for summary judgment on both Petroleum Solutions' and Head's claims, urging that no evidence showed that a Titeflex-manufactured connector was used in the Silver Spur's fuel system. The trial court ultimately denied Titeflex's motion. Petroleum Solutions also twice moved for summary judgment on limitations grounds, but the trial court denied both motions. Petroleum Solutions then designated an expert to opine that the damages resulting from the leak were attributable to the flex connector, but the expert failed to attend three noticed depositions and was de-designated by Petroleum Solutions on the eve of trial.

---

[1] Head's sixth amended petition is the live pleading in this action. In accordance with that pleading, the claims submitted to the jury included negligence, negligent undertaking, breach of contract, fraud, breach of implied warranty of good and workmanlike services, and breach of fiduciary duty.

In January 2008, Titeflex moved for sanctions against Petroleum Solutions. Titeflex claimed that Petroleum Solutions spoliated evidence by failing to produce the allegedly faulty flex connector and sought a jury instruction to that effect. Head then nonsuited its claims against Titeflex and also moved for sanctions against Petroleum Solutions. Head argued that Petroleum Solutions intentionally destroyed crucial evidence and requested that the trial court consider a broad range of sanctions, including striking Petroleum Solutions' pleadings. Petroleum Solutions responded to the sanctions motions with an affidavit from Neally and the deposition testimony of Hendrix and Heinsohn. Petroleum Solutions argued that it did not deliberately destroy any evidence, had not engaged in culpable or negligent conduct with respect to the flex connector, and did not have a duty to preserve the flex connector once the limitations period had expired.

While the sanctions motions were pending, Titeflex filed a counterclaim against Petroleum Solutions, claiming it owed Titeflex a statutory duty of indemnity under Texas Civil Practice and Remedies Code chapter 82. Eventually, unable to produce the allegedly faulty flex connector or, after three failed attempts, an expert for deposition to state that a faulty flex connector caused the leak, Petroleum Solutions nonsuited its third-party claims against Titeflex shortly before trial. Titeflex's indemnity counterclaim remained pending. Head's live petition at the time of trial alleged that Petroleum Solutions had misrepresented that the flex connector caused Head's damages, and that those damages were caused by defects in the systems that Petroleum Solutions manufactured as well as by Petroleum Solutions' failure to properly install, maintain, and repair the systems.

At a pretrial hearing on Titeflex's and Head's motions for sanctions, the trial court struck Petroleum Solutions' affirmative defenses, including its statute-of-limitations and statutory-

indemnity defenses, and ruled that a spoliation instruction would be given to the jury. Head's and Titeflex's claims against Petroleum Solutions then proceeded to trial. At trial, Head urged that Petroleum Solutions had repeatedly misrepresented the cause of the leak. Head offered expert testimony that Petroleum Solutions' improper installation of a union at a shear valve, not the flex connector, caused the leak. The jury charge included the following spoliation instruction:

> You, the jury, are instructed that Petroleum Solutions, Inc. destroyed, lost, or failed to produce to this Court material evidence that by law should have been produced as evidence for your deliberations. You are further instructed you may, but are not required to, presume this evidence is unfavorable to Petroleum Solutions, Inc.

The jury found in Head's favor and awarded Head nearly $1.2 million. As to Titeflex's statutory-indemnity claim, the jury found that Petroleum Solutions was a manufacturer, that Titeflex was a seller, and that Titeflex incurred reasonable attorney's fees and expenses of $450,853.62. The trial court rendered judgment on the jury's verdict, and Petroleum Solutions appealed.

The court of appeals, with one justice dissenting, affirmed the trial court's judgment except as to the amount of prejudgment interest. ___ S.W.3d ___, ___. The court concluded that the sanctions order was not an abuse of discretion because Petroleum Solutions' failure to preserve the flex connector significantly prejudiced Head and Titeflex, and Petroleum Solutions' repeated attempts to minimize its fault amounted to bad faith deserving of severe sanctions. *Id.* at ___. The court of appeals also concluded that Petroleum Solutions' arguments regarding the statute of limitations were not relevant, that there was legally and factually sufficient evidence supporting the verdict on Head's claims, and that Titeflex was entitled to statutory indemnity from Petroleum Solutions. *Id.* at ___, ___. The dissenting justice took issue with the trial court's failure to articulate

7

any connection between Petroleum Solutions' inability to produce the flex connector and the striking of Petroleum Solutions' statute-of-limitations defense. *Id.* at ___ (Vela, J., dissenting). The dissent would have remanded the case for a new trial in which Petroleum Solutions could assert its defenses. *Id.* at ___.

## II. The Trial Court's Sanctions

Petroleum Solutions challenges the trial court's imposition of spoliation sanctions and, more specifically, the court's submission of a spoliation jury instruction and striking of Petroleum Solutions' affirmative defenses, including its limitations defense. Petroleum Solutions contends that the trial court imposed death-penalty sanctions that violate the test set forth in *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913 (Tex. 1991). Applying the standard for spoliation sanctions we recently adopted in *Brookshire Brothers*, 438 S.W.3d at 20–26, we hold that the trial court abused its discretion and remand for a new trial.[2]

In *Brookshire Brothers*, we adopted a framework governing the imposition of remedies for evidence spoliation. We explained that whether a party spoliated evidence and whether a particular remedy is appropriate are questions of law for the trial court. *Id.* at 20. Because the trial court bears this responsibility, evidence of the circumstances surrounding alleged spoliation is generally inadmissible at trial, as such evidence is largely irrelevant to the merits and unfairly prejudicial to the spoliating party. *Id.* at 26. We further held in *Brookshire Brothers* that, to find that spoliation

---

[2] Petroleum Solutions contends it is entitled to rendition of judgment on grounds that the evidence was legally insufficient to support the jury's findings in Head's favor on its claims for negligence, fraud, breach of fiduciary duty, breach of contract, and breach of warranty. Because Petroleum Solutions failed to challenge the sufficiency of the evidence supporting the jury's finding in Head's favor on its negligent undertaking claim, which provides an independent basis to support the trial court's judgment, we need not address this issue.

8

occurred, the trial court must make affirmative determinations as to two elements. First, the party who failed to produce evidence must have had a duty to preserve the evidence. *Id*. at 20. "[S]uch a duty arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim." *Id*. (citation and internal quotation marks omitted). Second, the nonproducing party must have breached its duty to reasonably preserve material and relevant evidence. *Id*. A party cannot breach its duty without at least acting negligently. *Id*. at 20–21 & n.8.

Upon finding that spoliation occurred, the trial court must exercise its discretion in imposing a remedy. In determining what remedy, if any, is appropriate, the court should weigh the spoliating party's culpability and the prejudice to the nonspoliating party. *Id.* at 21. Prejudice is evaluated based on the spoliated evidence's relevancy to key issues in the case, whether the evidence would have been harmful to the spoliating party's case (or, conversely, helpful to the nonspoliating party's case), and whether the spoliated evidence was cumulative of other competent evidence that may be used in its stead. *Id*. at 21–22 (citing *Trevino v. Ortega*, 969 S.W.2d 950, 958 (Tex. 1998) (Baker, J., concurring)).

While the trial court's discretion to remedy an act of spoliation is broad, it is not limitless. We review a trial court's imposition of sanctions under an abuse of discretion standard. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). Texas Rule of Civil Procedure 215.2 allows a trial court to impose "just" sanctions for discovery abuse. TEX. R. CIV. P. 215.2. As we reaffirmed in *Brookshire Brothers*, courts generally follow a two-part test in determining whether a particular sanction for discovery abuse is just. 438 S.W.3d at 21 (citing *TransAmerican*, 811 S.W.2d at 917).

9

First, a direct relationship must exist between the offensive conduct, the offender, and the sanction imposed. *See id.*; *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003) (per curiam). To meet this requirement, a sanction must be directed against the wrongful conduct and toward remedying the prejudice suffered by the innocent party. *TransAmerican*, 811 S.W.2d at 917. Second, a sanction must not be excessive, which means it should be no more severe than necessary to satisfy its legitimate purpose. *Id.* This prong requires the trial court to consider the availability of lesser sanctions and, "in all but the most exceptional cases, actually test the lesser sanctions." *Cire*, 134 S.W.3d at 841.

In *Brookshire Brothers*, we also articulated more specific restrictions on a trial court's discretion to issue a spoliation instruction to the jury. We held that a trial court may submit a spoliation instruction only if it finds (1) the spoliating party acted with intent to conceal discoverable evidence, or (2) the spoliating party acted negligently and caused the nonspoliating party to be irreparably deprived of any meaningful ability to present a claim or defense.[3] 438 S.W.3d at 23–26. We noted in imposing this strict limitation that a spoliation instruction "can, in some sense, be tantamount to a death-penalty sanction," in that such an instruction can remove the focus of the trial from the merits of the case and redirect it to the alleged conduct that gave rise to the sanctions. *Id.* at 23. It follows, and we hold today, that in the context of remedying spoliation, the restrictions articulated in *Brookshire Brothers* with regard to spoliation instructions also limit a trial court's

---

[3] Generally, we have stated that, consistent with due process considerations, discovery sanctions that "are so severe as to preclude presentation of the merits of [a claim or defense] should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery." *TransAmerican*, 811 S.W.2d at 918; *Spohn*, 104 S.W.3d at 883. Similar reasoning underlies the limitations we placed on spoliation sanctions in *Brookshire Brothers*.

discretion to issue other remedies akin to death-penalty sanctions, such as striking a party's claims or defenses.

In this case, we need not and do not decide whether Petroleum Solutions spoliated evidence. We hold that, assuming it did, the trial court's sanctions were an abuse of discretion because no proof exists that Petroleum Solutions intentionally concealed evidence or that Petroleum Solutions' spoliation irreparably deprived Head and Titeflex of any meaningful ability to present their claims. First, no evidence shows that Petroleum Solutions acted with intent to conceal the flex connector,[4] as nothing in the record suggests that Petroleum Solutions was ever informed that the facility where the connector was being stored would be destroyed. To the contrary, the record shows the following undisputed facts: (1) Barron took a component from the Silver Spur with the express consent of the manager, Carpenter; (2) Barron gave the component to independent counsel, Neally; (3) Neally engaged the services of a metallurgist, Hendrix; (4) Hendrix took possession of the component and performed non-destructive testing; (5) Hendrix placed the component in a warehouse for storage; (6) the warehouse was torn down; (7) Petroleum Solutions was not told the warehouse was being torn down; (8) Head did not request that Petroleum Solutions produce the connector before the warehouse was demolished or at any time before filing suit; and (9) Petroleum Solutions asked Hendrix to return the connector when Head filed suit, but neither the warehouse staff nor Hendrix could find it. In sum, no evidence demonstrates that Petroleum Solutions intentionally lost or destroyed the connector.

---

[4] Only Head maintains that Petroleum Solutions acted intentionally. Titeflex notes in its briefing that it "has never contended that misplacement of the flex connector was deliberate or intentional."

11

Further, no evidence shows that the missing connector irreparably deprived Head and Titeflex of any meaningful ability to present their claims. At trial, Head's theory of Petroleum Solutions' liability was unrelated to the flex connector; Head successfully urged that Petroleum Solutions' improper installation of a union at a shear valve, not the flex connector, caused the leak. This fact, in conjunction with the fact that Head never requested access to the connector before filing suit,[5] confirms that the missing flex connector did not irreparably hinder Head's presentation of its claims. And as discussed further below, the missing flex connector did not hinder Titeflex's ability to present its indemnity claim.

In sum, the trial court abused its discretion in charging the jury with a spoliation instruction and striking Petroleum Solutions' affirmative defenses because those sanctions do not comply with the procedural and substantive standards set forth in *Brookshire Brothers*. The harm of such sanctions, which foreclose (or at least severely impede) a party from presenting the merits of its claims or defenses, is typically patent and is compounded by improper presentation of evidence and argument to the jury on the spoliation issue.[6] *See Brookshire Bros.*, 438 S.W.3d at 29; *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 724 (Tex. 2003). Accordingly, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings between Petroleum

[5] To the extent Head argues that Petroleum Solutions misrepresented the cause of the leak so as to prevent Head from filing suit within the limitations period, this argument will be relevant to the evaluation of Petroleum Solutions' statute-of-limitations defense on remand.

[6] We leave to the trial court's discretion the extent to which evidence of the missing connector is relevant to whether Head's claims are barred by limitations.

Solutions and Head consistent with this opinion.[7]  As discussed below, however, the unique circumstances of Titeflex's indemnity claim render harmless any spoliation error as it relates to that claim.

### III. Titeflex's Statutory-Indemnity Claim

Finally, we address whether Titeflex, a component-product manufacturer and seller, is entitled to indemnity from Petroleum Solutions, a finished-product manufacturer, under Texas Civil Practice and Remedies Code section 82.002, a provision of the Texas Products Liability Act.  As described above, Head sued Petroleum Solutions and Titeflex under a products-liability theory, Petroleum Solutions filed third-party claims against Titeflex for contribution and indemnity, and Titeflex filed a counterclaim against Petroleum Solutions for statutory indemnity under section 82.002.  Although both Head and Petroleum Solutions nonsuited their claims against Titeflex, the parties proceeded to trial on Titeflex's indemnity counterclaim.  The jury awarded Titeflex approximately $450,000 in attorney's fees and expenses, and the trial court rendered judgment on that verdict.  The court of appeals affirmed.

### A. Duty to Indemnify Between Finished-Product Manufacturers and Component-Product Manufacturers

Section 82.002 requires the manufacturer of an allegedly defective product to indemnify an innocent seller for any loss arising out of a products-liability action.  TEX. CIV. PRAC. & REM. CODE

---

[7] Petroleum Solutions contends that we should render judgment on its statute-of-limitations defense.  As noted above, the trial court twice denied Petroleum Solutions summary judgment on this defense.  Because the trial court struck the defense before trial, even if the court did so erroneously, it would be improper to render judgment for Petroleum Solutions on limitations grounds on appeal of the final judgment.  *See Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966) (refusing to review order denying summary judgment on appeal from final judgment).

§ 82.002(a); *see also Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 867 (Tex. 1999). The Act describes a manufacturer's duty to indemnify as follows:

> A manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable.

TEX. CIV. PRAC. & REM. CODE § 82.002(a). The term "loss" is defined to include "court costs and other reasonable expenses, reasonable attorney fees, and any reasonable damages." *Id.* § 82.002(b).

The Act broadly defines "products liability action," "seller," and "manufacturer":

> "Products liability action" means any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product . . . .
>
> "Seller" means a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof.
>
> "Manufacturer" means a person who is a designer, formulator, constructor, rebuilder, fabricator, producer, compounder, processor, or assembler of any product or any component part thereof and who places the product or any component part thereof in the stream of commerce.

*Id*. § 82.001(2)–(4). Under these definitions, "all manufacturers are also sellers, but not all sellers are manufacturers." *Gen. Motors Corp. v. Hudiburg Chevrolet, Inc.*, 199 S.W.3d 249, 256 (Tex. 2006) (*Hudiburg*). And, with one exception not relevant here, nothing in the Act precludes one person from being both a manufacturer and a seller of the same product or component. *See id*.

Titeflex contends that Petroleum Solutions owes it a duty to indemnify under section 82.002 because the fuel system is a product, Petroleum Solutions is the manufacturer of that product, and

14

Titeflex is the innocent seller of a component part allegedly used in Petroleum Solutions' defective finished product. In light of our analysis of the indemnity statute in *Hudiburg*, we agree.

In *Hudiburg*, a truck driver was injured and the driver of another vehicle was killed when the truck, which had been assembled by attaching a service body to a cab chassis, split apart during a collision. *Id.* at 252. A personal-injury and wrongful-death suit followed against both the chassis manufacturer and Hudiburg, the dealer who had sold the truck and arranged for it to be assembled. *Id.* In that suit, which eventually settled, the plaintiffs alleged that the vehicle, including its fuel system, was unreasonably dangerous. *Id.* Hudiburg then brought a statutory-indemnity action against the manufacturers of the cab chassis (GM) and the service body (Rawson-Koenig), the "component products" of the truck. *Id.*

Clarifying the framework governing a manufacturer's duty to indemnify under the Act, we reaffirmed that the duty is triggered by the injured claimant's pleadings. *Id.* at 256. Specifically, the duty is triggered by allegations of a defect in the manufacturer–indemnitor's product and is not dependent on an adjudication of the indemnitor's liability.[8] *Id.* By contrast, section 82.002(a)'s exception to the duty to indemnify for loss caused by the seller is triggered not by the pleadings, but by an affirmative finding that the seller–indemnitee is independently liable. *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 91 (Tex. 2001) ("[I]t is the manufacturer's 'duty to indemnify' that applies regardless of outcome, . . . [b]ut for the Manufacturers to implicate section 82.008(a)'s exception to that duty, it must be established that seller's conduct 'caused' the loss.").

---

[8] Under the common law, however, an indemnitor's liability for the product defect must be adjudicated or admitted. *Hudiburg*, 199 S.W.3d at 255.

Further elaborating on the statutory-indemnity framework in the context of claims involving both a finished-product manufacturer and seller as well as the manufacturer and seller of a component part incorporated into that finished product, we held:

> Under the statute, and disregarding the exception in section 82.002(d), the manufacturer of a component product alleged by a claimant to be defective has a duty to indemnify an innocent seller/manufacturer of a finished product which incorporates the component from loss arising out of a products liability action related to the alleged defect, *but the manufacturer of an allegedly defective finished product has a duty to indemnify the innocent seller/manufacturer of a component product for the same loss.* If neither the component-product manufacturer nor the finished-product manufacturer is innocent, depending not on allegations but on proof, both indemnity claims under the statute will fail. If both are innocent, again depending on proof, the indemnity claims offset each other.

*Hudiburg*, 199 S.W.3d at 256–57 (emphasis added). In other words, depending on the alleged product defect or defects, an injured claimant's pleadings may trigger a duty to indemnify on the part of the finished-product manufacturer, the component-product manufacturer, or both. *See id.* If competing duties to indemnify are triggered, the ultimate success of those claims will depend on what the evidence shows as to the fault of the indemnitee sellers. *See id.*

In light of the claimant's allegations in *Hudiburg* that the component product manufactured by GM—the chassis—was defective, we held that GM owed Hudiburg a duty to indemnify for losses related to the personal-injury suit, to the extent Hudiburg was not independently liable.[9] *Id.* at 262. We also noted that, consistent with the statutory framework, "GM would be entitled to statutory

---

[9] Rawson-Koenig, on the other hand, did not owe Hudiburg a duty to indemnify because the claimant's pleadings, which alleged only that the vehicle as a whole and the fuel system in particular were defective, could not fairly be read to allege a defect in the service body, which was the component product Rawson-Koenig manufactured. *Hudiburg*, 199 S.W.3d at 257–58; *see also Meritor Auto., Inc.*, 44 S.W.3d at 91.

indemnity from Hudiburg—although GM has not sought indemnity—for losses related to allegations of defects unrelated to the chassis, if GM was not independently liable for such losses." *Id.*

Applying *Hudiburg* to the case at hand, we hold that Petroleum Solutions owed Titeflex a statutory duty of indemnity. Head initially sued only Petroleum Solutions for damages resulting from the fuel leak, alleging the leak was caused by both a defective flex connector as well as a "faulty" line leak detector and leak-detection system. Shortly after Petroleum Solutions brought third-party claims against Titeflex, Head amended its petition to assert a strict-liability claim directly against Titeflex and to clarify the allegations that the leak-detection system as a whole was defective and was manufactured by Petroleum Solutions. After nonsuiting Titeflex, Head again amended its petition to retract the allegations of a defective flex connector and to allege only product defects that were attributable solely to Petroleum Solutions. Based on Head's pleadings, Petroleum Solutions, the manufacturer of an allegedly defective finished product (the fuel system), owed Titeflex, the alleged seller of a component part of that product, a duty to indemnify it under section 82.002 for losses arising out of this products-liability action, to the extent Titeflex was not independently liable for those losses.[10] And while Titeflex's losses are limited to its attorney's fees and costs incurred in the suit, such expenditures qualify as "losses" under the indemnity statute. TEX. CIV. PRAC. & REM. CODE § 82.002(b).

---

[10] We note that, based on Head's early pleadings, Titeflex also owed Petroleum Solutions a competing duty to indemnify it for losses related to alleged defects in the flex connector, to the extent Petroleum Solutions was not independently liable. *Hudiburg*, 199 S.W.3d at 262. However, Head amended its pleadings to delete any allegations of a defective flex connector, and Petroleum Solutions nonsuited its indemnity and contribution claims against Titeflex before trial.

Citing *Hudiburg* and *Owens & Minor, Inc. v. Ansell Healthcare Products, Inc.*, 251 S.W.3d 481 (Tex. 2008), the dissent contends that, even if Head's pleadings triggered Petroleum Solutions' duty to indemnify Titeflex for its losses in this action, that duty did not extend to alleged defects in the flex connector that Petroleum Solutions did not manufacture. Similarly, Petroleum Solutions argues that *Hudiburg*'s reasoning does not apply here because Titeflex was sued only for alleged defects in the flex connector, and "[Petroleum Solutions] could not be liable to indemnify Titeflex for a product that [Petroleum Solutions] did not manufacture." That Petroleum Solutions did not manufacture the flex connector, however, is immaterial. The indemnity statute broadly provides that "[a] manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action," except to the extent the seller is independently liable. TEX. CIV. PRAC. & REM. CODE § 82.002(a). The purpose of section 82.002 is to protect innocent sellers by assigning responsibility for the burden of products-liability litigation to product manufacturers. *Hudiburg*, 199 S.W.3d at 255, 262. When an injured claimant pleads that a manufacturer's product is defective, an innocent seller who suffers loss is protected regardless of whether it is upstream or downstream of that product's manufacturer. *Id.* at 256. Thus, as the manufacturer of an allegedly defective finished product, Petroleum Solutions has a duty to indemnify an innocent seller of a component integrated into that product, such as Titeflex, for its loss arising out of Head's products-liability action.

The dissent's reliance on *Owens & Minor* is inapposite. In that case, we held that a latex-glove manufacturer did not owe an innocent distributor a duty to defend and indemnify it against claims involving gloves that other companies manufactured. 251 S.W.3d at 482. From this holding, the dissent opines that Titeflex cannot recover for its losses because Head's pleadings did not

18

attribute the defective fuel system to Titeflex, only the flex connector. This application is improper in light of the circumstances presented and renders the framework recognized in *Hudiburg* a nullity.[11] *Owens & Minor* involved a one-way duty to indemnify owed by multiple manufacturers to a non-manufacturing seller[12] for its losses. By contrast, this case involves the competing duties to indemnify owed to each other by a finished-product manufacturer and a component-product manufacturer. As we held in *Hudiburg*, the duty to indemnify when both of these products are alleged to be defective runs both ways, as Petroleum Solutions and Titeflex are both manufacturers and sellers of their respective products *vis-a-vis* each other. 199 S.W.3d at 256. When these competing claims are pursued, *Hudiburg* explains that the burden will ultimately fall on the party whose product is found to be defective. *See id.* at 256–57 (recognizing that such competing claims will both fail if the evidence shows that neither party is innocent, and will offset each other if the evidence shows that both are innocent).

In this case, only Titeflex pursued its indemnity claim through trial, and, as discussed below, no evidence supports a finding that Titeflex was independently liable for its loss. Accordingly, Titeflex is entitled to recover for its loss arising out of this products-liability action.

---

[11] While the dissent couches its analysis in terms of the scope of the duty, the result of the dissent's interpretation is that a component-product manufacturer could only be entitled to indemnity if an injured plaintiff alleged it was directly responsible for unrelated defects in other components or the finished product. As a practical matter, that will rarely, if ever, happen.

[12] Only manufacturers owe a duty to indemnify under chapter 82. TEX. CIV. PRAC. & REM. CODE § 82.002(a).

## B. Improvement to Real Property May Constitute a Product

Petroleum Solutions next argues that the fuel system was an improvement to real property, not a "product" that it manufactures, and that the indemnity statute therefore does not apply. Our decision in *Fresh Coat, Inc. v. K-2, Inc.* forecloses this argument. 318 S.W.3d 893 (Tex. 2010). The issue in *Fresh Coat* was whether a synthetic-stucco system comprised of components that were installed on a house's exterior walls constituted a product for purposes of the indemnity statute. *Id.* at 895. We explained that, pursuant to the statute, "a product is something distributed or otherwise placed, for any commercial purpose, into the stream of commerce for use or consumption." *Id.* at 897. We held that the stucco system was a product under that broad definition and rejected the manufacturer's argument that "products placed into the stream of commerce are not products once they become integrated into . . . real property." *Id.*

Here, Petroleum Solutions makes the same argument we rejected in *Fresh Coat*. Petroleum Solutions cites several courts of appeals' decisions for the general premise that the law distinguishes between products and improvements to real property. However, none of the cases Petroleum Solutions cites involved the indemnity statute, and they all predate our decision in *Fresh Coat*. We therefore hold that the fuel system qualifies as a product under chapter 82 notwithstanding its integration into real property.

## C. Resolution of Titeflex's Indemnity Claim

For the foregoing reasons, we agree with the trial court and court of appeals that Petroleum Solutions owed Titeflex a duty to indemnify under section 82.002. Petroleum Solutions argues that, because the trial court erroneously struck its indemnity defenses as a spoliation sanction, Titeflex's

indemnity claim should be remanded for a new trial along with Head's claims so that Petroleum Solutions may seek a jury finding that Titeflex was independently liable for its loss. Petroleum Solutions contends that the record contains excluded evidence implicating a defective product manufactured by Titeflex that would have supported such a finding. We disagree. Having reviewed all the record evidence on which Petroleum Solutions relies, both that admitted and that excluded at trial, we find that the only evidence that Titeflex even manufactured the connector in question was Barron's statements (both in testimony and in letters sent by Petroleum Solutions in 2001 and 2002) that Petroleum Solutions had identified a Titeflex connector as the culprit. Petroleum Solutions has never been able to produce any documentation supporting that statement, and other evidence in the record rebuts it. Moreover, other than Barron's conclusory testimony that the missing connector leaked during pressure testing and a statement in a one-page work report generically referencing a "bad flex hose," Petroleum Solutions has never identified any evidence that would support a finding that the connector in question was defective or caused the leak. Petroleum Solutions' expert on the connector failed to attend his deposition and was de-designated on the eve of trial independently of the trial court's sanctions. *See Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004) (noting that "competent expert testimony and objective proof that a defect caused the [injury]" are generally necessary to support a finding that a third party is responsible based on a design defect).

In sum, we see nothing in the record, including the evidence that the trial court excluded, that constitutes more than a scintilla of evidence to support a finding that Titeflex was independently liable for its loss. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or

21

suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence."). Accordingly, any error by the trial court in meting out spoliation sanctions was harmless with respect to Titeflex's indemnity claim.[13] *See Brown v. Goldstein*, 685 S.W.2d 640, 641 (Tex. 1985) (holding that a judge may refuse to submit an issue to the jury "if no evidence exists to warrant its submission"). Remanding that claim for a new trial would serve no purpose other than delay and added expense for all involved. Accordingly, our reversal of the court of appeals' judgment as to the claims between Head and Petroleum Solutions does not affect the validity of the judgment in favor of Titeflex, and we affirm that portion of the judgment.

* * * *

We hold that the trial court's spoliation sanctions were an abuse of discretion and that the court of appeals erred in affirming the judgment in Head's favor. However, we agree with the portion of the court of appeals' judgment in favor of Titeflex. We therefore affirm the court of appeals' judgment in part, reverse it in part, and remand for further proceedings between Head and Petroleum Solutions consistent with this opinion.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** December 19, 2014

---

[13] Further, the only findings the jury made with respect to the indemnity claim, other than the amount of attorney's fees and expenses Titeflex incurred, were that Petroleum Solutions was a manufacturer and Titeflex was a seller. The trial court, not the jury, found that Titeflex was "an innocent seller" and was entitled to indemnity as a matter of law. Accordingly, the improper spoliation instruction was irrelevant to the indemnity claim.

22