# IN THE SUPREME COURT OF TEXAS

No. 14-0650

CENTERPOINT BUILDERS GP, LLC AND CENTERPOINT BUILDERS, LTD.,
PETITIONERS,

v.

TRUSSWAY, LTD., RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS

**Argued November 2, 2015**

JUSTICE LEHRMANN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE WILLETT, JUSTICE GUZMAN, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE JOHNSON joined.

Texas Civil Practice and Remedies Code chapter 82 entitles the "seller" of a defective product to indemnity from the product manufacturer for certain losses. In this case, the general contractor hired to construct an apartment complex seeks indemnity under chapter 82 from the manufacturer of wooden trusses used in roofing and drywall projects on the site. The sole issue is whether the general contractor qualifies as a truss seller under chapter 82. The trial court held that it does, but the court of appeals disagreed and rendered judgment for the manufacturer on the indemnity claim. Applying chapter 82's definition of "seller," we agree with the court of appeals that the general contractor is not a seller and affirm the court's judgment.

**I**

Glenmont Madison Beaumont LLC hired Centerpoint Builders, Ltd. (now known as Centerpoint Builders, LLC) as the general contractor to build the Beaumont Trace Apartments. Centerpoint subcontracted with McEvers Maverick Builders to install sheetrock and drywall, and with Sandidge & Associates, Inc. to install wooden roof trusses.[1] Centerpoint purchased the trusses directly from their manufacturer, Trussway, Ltd.

The underlying lawsuit arose when Merced Fernandez, an independent contractor hired by Sandidge, stepped onto a truss that had been laid in position but not yet installed. Fernandez was carrying sheetrock while walking across the trusses above the second story. A truss broke and Fernandez fell eight to ten feet, rendering him paraplegic. Fernandez sued Glenmont, Centerpoint, Maverick, Sandidge, and Trussway for, among other related claims, failing to use reasonable and appropriate care to correct, remedy, or warn of an unreasonably unsafe condition on the property, failing to adequately supervise, failing to use good quality building materials, and negligently designing, manufacturing, and testing the truss. Fernandez ultimately settled with all defendants.

Centerpoint filed a cross-action against Trussway for statutory indemnity, alleging that Trussway, the truss manufacturer, was legally required to indemnify Centerpoint, the truss seller, for any loss arising from Fernandez's suit. Trussway responded with its own indemnity crossclaim against Centerpoint.

Centerpoint and Trussway filed cross-motions for summary judgment. Centerpoint also sought partial summary judgment on its own claim, arguing that it was a seller under chapter 82

---

[1] Trusses are wooden beams that are nailed together to support a building's roof.

and was entitled to indemnity as a matter of law. The trial court granted Centerpoint's motion as to Trussway's claim. With respect to the motions on Centerpoint's claim, the court held as a matter of law that Centerpoint was a seller under chapter 82, but otherwise denied both parties' requests for summary judgment. The trial court certified its order for interlocutory appeal. TEX. CIV. PRAC. & REM. CODE § 51.014(d) (allowing a trial court to permit an interlocutory appeal of an otherwise unappealable order if certain conditions are met).

The court of appeals reversed in part, holding that Centerpoint did not fit the statutory definition of a seller and was not eligible to seek indemnity. 436 S.W.3d 882, 888 (Tex. App.—Beaumont 2014). The court of appeals also affirmed the trial court's summary judgment in Centerpoint's favor on Trussway's cross-claim because Centerpoint did not manufacture the truss and therefore was not obligated to indemnify Trussway. *Id.* at 889. Only Centerpoint filed a petition for review, presenting as its sole issue whether the court of appeals erred in holding Centerpoint was not a seller. Centerpoint contends that the court of appeals' analysis conflicts with our opinion in *Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d 893 (Tex. 2010),[2] and that the trial court correctly recognized Centerpoint's seller status.

## II

The Texas Products Liability Act gives the innocent seller of an allegedly defective product a statutory right to indemnity from the product's manufacturer for losses arising out of a products-liability action. *Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 491 (Tex. 2014). This statutory

---

[2] We have jurisdiction over interlocutory appeals in which the court of appeals "holds differently from a prior decision of" this Court, meaning "there is inconsistency in the[] respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants." TEX. GOV'T CODE § 22.225(c), (e). The parties present a genuine dispute about whether the court of appeals correctly applied *Fresh Coat*, revealing uncertainty to be clarified in this area.

3

right is "in addition to any duty to indemnify established by law, contract, or otherwise." TEX. CIV. PRAC. & REM. CODE § 82.002(e)(2). In construing the Act, as with any statute, we start with the "ordinary meaning of the statutory text." *In re Ford Motor Co.*, 442 S.W.3d 265, 271 (Tex. 2014). We analyze that language in context, considering the specific sections at issue as well as the statute as a whole. *CHCA Woman's Hosp. v. Lidji*, 403 S.W.3d 228, 231–32 (Tex. 2013). While we are limited to the statute's text, "we must attempt to give effect to every word and phrase," and we may not omit or gloss over verbiage in an attempt to reclaim clarity. *Abrams v. Jones*, 35 S.W.3d 620, 625 (Tex. 2000). We "presume[] the Legislature deliberately and purposefully selects words and phrases it enacts, as well as deliberately and purposefully omits words and phrases it does not enact." *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012).

The Act's indemnity provision states:

A manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable.

TEX. CIV. PRAC. & REM. CODE § 82.002(a). "Products liability action" is broadly defined as "any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product." *Id.* § 82.001(2). The term includes "all direct allegations against the seller that relate to plaintiff's injury." *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex. 2001).

We have explained that the "purpose of section 82.002 is to protect innocent sellers by assigning responsibility for the burden of products-liability litigation to product manufacturers." *Petroleum Sols.*, 454 S.W.3d at 494. To that end, the duty to indemnify is triggered by allegations

4

in the injured claimant's pleadings of a defect in the manufacturer's product, regardless of any adjudication of the manufacturer's liability to the claimant. *Gen. Motors Corp. v. Hudiburg Chevrolet, Inc.*, 199 S.W.3d 249, 255 (Tex. 2006); *see Owens & Minor, Inc. v. Ansell Healthcare Prods., Inc.*, 251 S.W.3d 481, 484 (Tex. 2008) ("The manufacturer's duty begins when it is given notice that a seller has been sued."). The manufacturer may "escape this duty to indemnify" by proving that the seller's "acts or omissions independent of any defect in the manufactured product cause[d] injury." *Hudiburg*, 199 S.W.3d at 252, 255.

While the scope of a manufacturer's duty to indemnify is often described as broad, it is owed only to sellers, and an indemnity claimant's seller status is a necessary prerequisite to maintaining a claim. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 867 (Tex. 1999) ("Anyone who qualifies as a 'seller' may seek indemnification, subject to the limitations of section 82.002(a)."). The Act defines "seller" as "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof." TEX. CIV. PRAC. & REM. CODE § 82.001(3).[3]

The statute does not define the phrase "engaged in the business of." Black's Law Dictionary defines "engaged" as "to employ or involve oneself; to take part in; to embark on."

---

[3] To the extent any question lingers as to whether the pleadings trigger seller status rather than the facts and evidence, we answer that question in the negative. Our precedent consistently determines seller or manufacturer status based on the evidence, and nothing in section 82.002(a) or the statute's purpose supports allowing the pleadings to dictate whether a party qualifies as a manufacturer or seller. *See, e.g.*, *Fresh Coat*, 318 S.W.3d at 899 (analyzing the evidence to conclude that Fresh Coat was a seller); *Fitzgerald*, 996 S.W.2d at 867 (noting that the definition of seller included the petitioner, "who sells spinal fixation devices, a product, for use by its customers"); *see also Hadley v. Wyeth Labs., Inc.*, 287 S.W.3d 847, 850 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (noting that chapter 82's expansion of a seller's indemnity rights by allowing the duty to indemnify to be triggered by allegations "does not suggest an additional legislative intent to also broaden the scope of defendants who are considered sellers").

5

BLACK'S LAW DICTIONARY 646 (10th ed. 2014); *State Office of Risk Mgmt. v. Carty,* 436 S.W.3d 298, 302 (Tex. 2014) (noting that "[u]ndefined terms in a statute are typically given their ordinary meaning [unless] a different or more precise definition is apparent from the term's use in the context of the statute" (citation and internal quotation marks omitted)). "Business" is defined as a "commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain." BLACK'S LAW DICTIONARY at 239. And the similar phrase "doing business" is defined as "the carrying out of a series of similar acts for the purpose of realizing a pecuniary benefit." *Id.* at 590. Our analysis cannot begin and end with the definitions of individual words, however, because the Legislature used an entire phrase: "engaged in the business of." *See In re Office of Atty. Gen.*, 422 S.W.3d 623, 629 (Tex. 2013) ("We must endeavor to read the statute contextually, giving effect to every word, clause, and sentence.").

Centerpoint argues that it is a truss seller entitled to indemnity from the truss manufacturer for Centerpoint's losses arising out of this lawsuit, in which Fernandez alleged in part that a defective truss caused his injuries. Like the court of appeals, our inquiry is limited to Centerpoint's seller status.

### III

### A

Whether a general contractor may seek statutory indemnity as a seller of materials used in a building's construction is an issue of first impression in this Court. We addressed the seller status of a subcontractor in *Fresh Coat* and begin with that case, cited extensively by both the parties and the court of appeals.

6

Fresh Coat contracted with a homebuilder to install synthetic stucco components (collectively referred to as EIFS, or exterior insulation and finishing system) on the exterior walls of several homes. *Fresh Coat*, 318 S.W.3d at 895. The contract required Fresh Coat to provide "labor, services and/or materials, equipment, transportation, or facilities" necessary to apply and finish the synthetic stucco. *Id.* at 899 (internal quotation marks omitted). Fresh Coat purchased EIFS components from their manufacturer and installed them pursuant to Fresh Coat's contract with the builder. *Id.* at 895. After moving in, more than 90 homeowners sued Fresh Coat, the EIFS manufacturer, and the builder, alleging the EIFS allowed water penetration that damaged their homes. *Id.* The builder sought indemnity from Fresh Coat and the manufacturer, and Fresh Coat in turn sought indemnity from the manufacturer. *Id.* at 896. The homeowners settled with all defendants, and Fresh Coat settled with the builder. *Id.* At issue in the court of appeals and this Court was a judgment in Fresh Coat's favor on its indemnity claim against the manufacturer. The builder's indemnity claims were not before us.

The issue pertinent to this case was whether Fresh Coat qualified as a seller. Rejecting the manufacturer's characterization of Fresh Coat as a service provider and not a product seller, we held that chapter 82 "anticipates that a product seller may also provide services" and that a company's "installation services do not preclude it from also being a seller." *Id.* at 899. We agreed with the court of appeals that Fresh Coat presented legally sufficient evidence it was a seller entitled to seek indemnity under chapter 82 even though the stucco was a component part of improved real property, which is not considered a product. *Id*. at 898–99; *see also* RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 19 cmt. e (1998) ("Traditionally, courts have been reluctant to

7

impose products liability on sellers of improved real property in that such property does not constitute goods.").

Centerpoint contends that, like Fresh Coat, it is both a product seller and a service provider. It argues that the contract and truss purchase order show that Centerpoint was "in the business of placing the trusses, for a commercial purpose (fulfilling its contract to build the apartment building), into the stream of commerce for use or consumption." Trussway responds that Centerpoint, like most builders, "is 'engaged in the business' of selling construction services," not building materials. For the reasons discussed below, we agree with Trussway.

In holding that Fresh Coat was a seller, we relied in part on witness testimony that the company was "in the business of providing EIFS products combined with the service of EIFS installation."[4] *Fresh Coat*, 318 S.W.3d at 899. But we did not elaborate on the contents of that testimony, instead addressing and rejecting the manufacturer's legal argument that Fresh Coat was *precluded* from being a seller because it also provided installation services. *Id.* Further, the contractor at issue in *Fresh Coat* sold and installed a particular product, and we were not required to consider how and if the analysis would be affected if the person seeking seller status were a general contractor constructing an improvement to real property. Accordingly, we find guidance in case law on more factually similar footing.

---

[4] We also noted that Fresh Coat had installed the EIFS pursuant to the manufacturer's instructions, which was significant in light of section 82.002(d)'s recognition that "a wholesale distributor or retail seller who completely or partially assembles a product in accordance with the manufacturer's instructions shall be considered a seller." *Fresh Coat*, 318 S.W.3d at 899 (quoting TEX. CIV. PRAC. & REM. CODE § 82.002(d)). This provision does not apply here.

8

**B**

In evaluating Centerpoint's seller status, we do not examine whether Centerpoint has ever sold trusses, but whether Centerpoint is "engaged in the business of" selling trusses. Aside from the court of appeals' opinion in this case, we have found few Texas cases addressing whether a general contractor is a seller of the materials it incorporates into construction projects. But the cases we have found, which typically involve whether a general contractor is a seller for strict-liability purposes, are consistent with the court of appeals' conclusion that Centerpoint is not a seller. In *Barham v. Turner Construction Co. of Texas*, for example, the plaintiff, injured during construction of an office building when a steel column fell and struck his head, sued the general contractor hired to construct the building. 803 S.W.2d 731, 734 (Tex. App.—Dallas 1990, writ denied). The trial court refused to submit jury questions and instructions on the plaintiff's products-liability claim against the contractor, and the court of appeals agreed, holding that the contractor was not a seller with respect to the steel columns. *Id.* at 737–38. Examining the distinction between a company in the business of selling its services and a company in the business of selling products, the court explained:

> Turner Construction is in the business of selling its services as a general contractor. We find nothing in the record to indicate that Turner Construction is in the business of selling the steel columns and erection plates which caused Barham's injury. Any alleged "sale" of the steel columns by Turner Construction was incidental to its contract to provide the services necessary to construct a building.

*Id.* at 738; *cf. Peterson Homebuilders, Inc. v. Timmons*, No. 14-03-00400-CV, 2004 WL 1660936, at *5 (Tex. App.—Houston [14th Dist.] July 27, 2004, no pet.) (mem. op.) (holding that a subcontractor that built a foundation pad for a house did not owe the general contractor a duty to

9

indemnify because the subcontractor "did not place this structural pad in the stream of commerce").[5]

Case law from other jurisdictions, while sparse, also supports a determination that general contractors typically are not "engaged in the business of" selling or distributing the materials used in constructing a particular improvement. In *Maack v. Resource Design & Construction, Inc.*, homeowners sued the builder for strict liability, alleging that defects in the home's exterior components led to water leaks. 875 P.2d 570, 573 (Utah Ct. App. 1994), *abrogated in part on other grounds by Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234 (Utah 2009). The Utah Court of Appeals held that the builder was not a "seller" of the house's exterior component parts, explaining: "The evidence is undisputed that [the contractor and its owner] were construction contractors who simply utilized these component parts when constructing the residence—they were not in the business of selling stucco, adhesives, or membranes on a wholesale or retail basis." *Id.* at 581; *compare Fresh Coat*, 318 S.W.3d at 899

---

[5] We recognize that the issue in many of these cases was whether the plaintiff could maintain a common-law strict-liability claim against a general contractor as a seller, not whether the contractor could bring a statutory-indemnity claim as a seller. *E.g.*, *Barham*, 803 S.W.2d at 734. However, the Legislature chose to define "seller" in chapter 82 just as we have construed the term for strict-liability purposes. Strict liability is limited to those "engaged in the business of selling" a product, which we have long interpreted to include those "engaged in the business of introducing the products into channels of commerce." *Armstrong Rubber Co. v. Urquidez*, 570 S.W.2d 374, 375 (Tex. 1978). "Seller" in turn is defined in the Products Liability Act as "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof." TEX. CIV. PRAC. & REM. CODE § 82.001(3). We presume the Legislature was aware of our case law when it enacted a substantially similar definition of "seller" in the Products Liability Act. *In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012) ("A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it." (internal quotation marks and citation omitted)). Oddly, by arguing that it is a seller for statutory-indemnity purposes, Centerpoint is essentially conceding that it would be a seller for purposes of a strict-liability claim brought by an injured party.

(noting the evidence that the indemnity claimant was "in the business of providing EIFS products combined with the service of EIFS installation").

Other cases take a similar approach in denying seller status to contractors whose business is providing construction services, not any particular building material that may be utilized in that process. *See, e.g.*, *Calloway v. City of Reno*, 993 P.2d 1259, 1272 (Nev. 2000) ("Although a contractor may, as part of a construction or remodeling project, install certain products, a contractor, without doing more, is not engaged in the business of 'manufacturing' or selling such products and therefore does not come within the ambit of [strict products liability]."), *superseded by statute on other grounds*, NEV. REV. STAT. § 40.635, *as recognized in Olson v. Richard*, 89 P.3d 31 (Nev. 2009); *Scordino v. Hopeman Bros.*, 662 So. 2d 640, 645 (Miss. 1995) (holding that a subcontractor hired to build the interior outfitting of a ship, which included providing the necessary services and materials, was not a "seller" of the wall paneling it provided and installed under the contract); *compare State Stove Mfg. Co. v. Hodges*, 189 So. 2d 113, 115, 123–24 (Miss. 1966) (holding that contractors that installed a water heater as part of their construction of a residence were subject to strict liability because they also operated the hardware store that sold the water heater to the homeowners), *superseded by statute on other grounds*, MISS. CODE ANN. § 11-1-63, *as recognized in Huff v. Shopsmith, Inc.*, 786 So. 2d 383 (Miss. 2001).[6]

---

[6] In classifying general contractors in contexts other than indemnity and strict liability, courts similarly focus on the fact that contractors' businesses involve the rendition of construction services, while "the materials that pass are incidental." *State, Dept. of Revenue v. Debenham Elec. Supply Co.*, 612 P.2d 1001, 1002–03 (Alaska 1980) (holding that contractors were not "dealers" of products for sales tax purposes); *Nixon v. U. S. Fid. & Guar. Co.*, 290 So. 2d 26, 27–29 (Fla. 1973) (holding that "products–completed operations" exclusion in general contractor's liability policy did not preclude coverage and noting the "significance that [the insured] is engaged in the general contracting business; he is not a manufacturer or seller of goods or products"); *Material Serv. Corp. v. McKibbin*, 43 N.E.2d 939, 946 (Ill. 1942) ("A contractor holds himself out to the public as having the skill and knowledge necessary to the construction of certain improvements. He does not represent himself as being engaged in the business of selling building material.").

We agree with the reasoning of these cases and hold that one is not "engaged in the business of" selling a product if providing that product is incidental to selling services. Applying that standard here requires the conclusion that Centerpoint is not a truss "seller" entitled to seek indemnity from the manufacturer. To that end, whether Centerpoint technically sold trusses to Glenmont does not make it "engaged in the business of" commercially distributing that product.[7] As in *Barham*, any "'sale' of [trusses] by [Centerpoint] was incidental to its contract to provide the services necessary to construct a building."[8] *Barham*, 803 S.W.2d at 738. This is consistent with the way the materials were priced in the contract. Centerpoint did not set prices on the materials to achieve a gain or profit;[9] it was effectively reimbursed for the cost of materials that were necessary to complete construction.[10]

---

[7] By way of example, consider a hair salon that offers haircuts that include a wash and style. When the client walks out of the salon, she has shorter hair, but she also has a head full of hair product. The price of the haircut will inevitably include the cost of the product that was used. Still, a hairdresser is in the business of selling haircuts, not selling handfuls of mousse. One does not go to the hair salon to acquire a dollop of moisturizing serum and a few spritzes of hairspray, just as a person does not retain a general contractor to acquire trusses.

[8] Centerpoint's standard form contract with Glenmont provided that Centerpoint "shall fully execute the Work described in the Contract Documents." The term "Work" was defined in an ancillary document as "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by [Centerpoint] to fulfill [Centerpoint's] obligations. The Work may constitute the whole or a part of the Project." In turn, "Project" is defined as "the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by [Glenmont] and by separate contractors." Tellingly, the focus of the "Work" and the "Project" is "construction and services," and materials were ancillary to those services. By contrast, Fresh Coat's contract to install EIFS placed "labor, services and/or materials" on equal footing. *Fresh Coat*, 318 S.W.3d at 899. We therefore disagree with the dissent's contention that the two contracts contain no "relevant differences," *post* at ___, and, in any event, the contract language is but one consideration in our analysis.

[9] The "Contract Sum," constituting "the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents," was a stipulated lump sum subject to certain authorized additions and deductions. That sum included allowances for materials and equipment delivered at the site. If the actual costs were greater or less than the allowances, Centerpoint was to submit a change order.

[10] The dissent dismisses this consideration, citing examples of companies that may be engaged in the business of selling a product even if they do not seek to profit from the specific sales giving rise to an indemnity claim. *Post* at ___. But we are not mandating a profit-seeking motive as a prerequisite to seller status; we are simply identifying the pricing structure in Centerpoint's contract as pertinent to what it is "engaged in the business of" doing.

In turn, as the court of appeals noted, "Centerpoint's contract with the property owner covered innumerable construction products and materials that would be involved in the construction of the apartment complex." 436 S.W.3d at 888. And that is the nature of a general contractor's business when it builds based on custom designs and specifications, as the materials required for a particular project will vary. *See* RESTATEMENT (THIRD) OF TORTS: PROD. LIABILITY § 19 cmt. e (1998) ("A housing contractor, building and selling one house at a time, does not fit the pattern of a mass producer of manufactured products . . . ."). Although the quantity of materials used is not dispositive, we agree with Trussway's contention that "the fact that Centerpoint used innumerable building materials supports the conclusion that any single material was incidental to its provision of construction services."

In sum, we hold that a general contractor who is neither a retailer nor a wholesale distributor of any particular product is not necessarily a "seller" of every material incorporated into its construction projects for statutory-indemnity purposes. Whether a person or entity is "engaged in the business of" selling a service, selling a product, or doing both (as in *Fresh Coat*)— regardless of the person's classification as a general contractor or subcontractor—depends upon the specific facts at issue. In this case, evidence that the general contractor agreed to undertake construction of the entire building and to be reimbursed for the cost of the materials (including the trusses) indicates that Centerpoint was selling construction services rather than trusses or other building materials. While some contractors may engage in the business of selling both products and services, the record is devoid of evidence that Centerpoint was doing so here. Instead, the record shows that any sale of the trusses by Centerpoint "was incidental to its contract to provide the services necessary to construct a building." *Barham*, 803 S.W.2d at 738. Because Centerpoint

was "engaged in the business" of providing a service, and its provision of trusses was incidental to that service, Centerpoint is not a "seller" under the Products Liability Act.[11]

**C**

Finally, we address the dissent's reliance on two cases from this Court that purportedly support the dissent's conclusion that Centerpoint is a seller. Neither of those cases involves contractors, and neither supports the dissent's position.

In *Barbee v. Rogers*, we held that the plaintiff could not pursue a strict-liability claim against licensed optometrists for failing to properly fit prescribed contact lenses to the plaintiff's eyes. 425 S.W.2d 342, 346 (Tex. 1968). We explained that the optometrists' activities "fall between those ordinarily associated with the practice of a profession and those characteristic of a merchandising concern." *Id.* at 345. In rejecting the strict-liability claim, we noted that in addition to "the disqualifying factor of the professional relationship," the claim was "not premised on any defect in the lenses as such." *Id.* at 346.

The dissent extrapolates from this statement that, had such a defect been alleged, "the optometrist would have been a 'seller' subject to strict liability even though the sales were incidental to the defendant's optometric services." *Post* at ___. But *Barbee* simply does not support this assertion. First, what we would have held in the event the plaintiff asserted a hypothetical defective-lens claim is not at all obvious, particularly in light of the professional relationship between the parties. *See Barbee*, 425 S.W.2d at 346. Further, the dissent assumes

---

[11] In reaching the opposite conclusion, the dissent implies that we have "stray[ed] from the plain language of a statute." *Post* at ___. Statutes are not always clear, and interpreting them can be a difficult task. That the Court and the dissent disagree on the ultimate interpretation of a statutory provision does not mean that either has "encroach[ed] on the Legislature's function." *Id.* at ___.

14

that product sales in *Barbee* were incidental to services, but we described evidence indicating the opposite, noting the defendants' "advertising and sales techniques designed to promote the sale of contact lenses at a predetermined and advertised price" and "their standardization of procedures and methods."[12] *Id.* We simply did not conduct a "seller" analysis, and the dissent's presumption about the outcome of such an analysis is neither helpful nor justified.

The dissent also cites *New Texas Auto Auction Services, L.P. v. Gomez de Hernandez*, in which we held that an auctioneer who conducted sales of automobiles was not a seller subject to strict liability. 249 S.W.3d 400, 405–06 (Tex. 2008). The parties in that case agreed that auctioneers are generally not considered sellers, and disputed only the significance of the fact that the defendant atypically held title to the allegedly defective vehicle when it was sold. *Id.* at 405. We found that fact immaterial, noting that strict liability "applies to those whose *business* is selling, not everyone who makes an occasional sale." *Id.* We agree with this broad proposition; however, our analysis in *New Texas Auto* of whether an auctioneer was a seller is of little help in this factually dissimilar case.

**IV**

The Products Liability Act defines "seller" not simply as "a person who sells" or "a person who places a product in the stream of commerce," but as a person "engaged in the business of" commercially distributing products. We may not ignore the Legislature's prudently selected words, lest we stray from the statute's plain language. Centerpoint has not shown that it is "engaged in the business of" commercially distributing or placing trusses in the stream of

---

[12] No such evidence was presented in this case.

15

commerce.  Accordingly, Centerpoint is not a "seller" entitled to seek indemnity under chapter 82.

We affirm the court of appeals' judgment.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 17, 2016