

**IN THE**
**TENTH COURT OF APPEALS**

_____

**No. 10-16-00420-CV**

**IN RE XTERRA CONSTRUCTION, LLC,**
**VENTURI CAPITAL, INC. D/B/A ARTISAN CABINETS**
**AND KEITH D. RICHBOURG**

_____

**Original Proceeding**

## OPINION

Relators Xterra Construction, LLC (Xterra), Venturi Capital, Inc. d/b/a Artisan

Cabinets (Venturi), and Keith D. Richbourg (collectively, the Xterra Defendants) seek

mandamus relief to vacate the "Order on Motion for Sanctions for Spoliation of

Evidence" that was signed by the trial court in the underlying case on November 22, 2016.

We conditionally grant mandamus relief.

### Factual Background

Xterra entered into a commercial lease contract with Daniel Hull and William H.

Beazley, Jr., to rent the warehouse located at 224 Kelly Drive in Waco, Texas. Richbourg,

who testified that he is the sole owner of both Xterra and Venturi, signed the lease

contract as Xterra's representative. Richbourg also signed a personal guaranty of the lease contract. The lease contract provided that Xterra was to use the warehouse for the purpose of "[w]oodworking and [c]abinet [m]aking." The term of the lease contract was March 15, 2013 to March 14, 2014. On March 15, 2014, Richbourg signed an amendment to the initial lease contract as Venturi's representative. The amendment stated that the term of the lease contract was extended through July 14, 2014. Thereafter, the term of the lease contract was again extended, ultimately to November 14, 2014.

On October 18, 2014, there was a fire at the warehouse. Richbourg and Hull agree that the Xterra Defendants were the sole tenants of the warehouse at that time. By October 20, 2014, Richbourg had notified Venturi's insurance carrier, Cincinnati Insurance Companies (Cincinnati), about the fire and had made a claim with the insurance carrier for Venturi's personal property that was lost or damaged by the fire.

Leann Williams, who was then a Cincinnati claims specialist, testified that she received an email regarding Venturi's claim on October 20. Soon after receiving the email, Williams spoke with Richbourg and scheduled to meet him at the warehouse later that day. Richbourg told Williams that the warehouse was secured. After talking to Richbourg, Williams then called Hull. Hull advised her that he was represented by Billy Davis and that Williams should talk to him. Finally, before meeting Richbourg at the warehouse, Williams forwarded the email regarding Venturi's claim to Jim Reil. Reil testified that he is a licensed professional engineer and a certified fire and explosion investigator and that he was asked by Cincinnati to examine the scene and to determine where the fire had originated and what had caused it.

Williams testified that she then met Richbourg on October 20 at the warehouse and that everything was secured at that time. Richbourg unlocked the door to the warehouse with a key, and they entered and walked through the building. There was a particular room in the warehouse where most of the fire damage had occurred—the room that Richbourg has referred to as the "finishing room" or "paint room." Richbourg testified that the materials that had been in the room were a complete loss. Williams explained that the room was where Venturi "finished the furniture, applied varnish or paint or whatever the customer needed on the furniture." Williams stated that she took photos of the scene that day but that neither she nor Richbourg took anything or moved anything from the scene. Williams and Richbourg eventually exited through the same door through which they had entered, and Richbourg locked the door when they left. Richbourg acknowledged that when he and Williams were leaving the premises, Williams specifically instructed him not to go back into the finishing room.

Williams stated that on October 21, 2014, she then finally spoke with Davis, the attorney whom Hull stated was representing him. Williams informed Davis that a cause-and-origin engineer was going to inspect the warehouse on October 23, 2014 and suggested that Hull might want to have a representative from his insurance carrier look at the warehouse as well. Davis told Williams, however, that Hull did not have any insurance. On October 22, 2014, Williams then emailed Reil some of the photos that she had taken on October 20 of the scene at the warehouse and informed Reil that it appeared that the fire had started in the paint room. Reil replied and confirmed that he had

arranged to meet Richbourg on the morning of October 23 and that he would call Williams after performing his inspection.

Richbourg testified that he let Reil into the building on October 23 and then left while Reil proceeded with his investigation, which Reil confirmed. Richbourg stated that Reil had told him that he would call him when he was concluding his investigation at the end of the day. Reil testified that he spent about six hours at the warehouse that day and took numerous photos of the scene. Reil ultimately identified a point of origin of the fire in the paint room. He also identified two portable air movers (AM1 and AM2) in the paint room, one of which—AM1—was located at the fire's point of origin. Reil testified that it is his opinion that a condition of defect within the motor of AM1 caused the fire. Emerson Electric Co. d/b/a Emerson Tool Company a/k/a Emerson Commercial & Residential Solutions (Emerson) is the manufacturer of the portable air movers.

Reil testified that he eventually stopped his inspection because he recognized that there were things that others might be interested in examining before the scene was altered. Reil acknowledged that when he stopped his inspection, he made an effort to secure the scene but that he did not put up any warning signs or caution tape to keep people out of the area. Reil put orange tape on or near AM1 and AM2 to mark them and to highlight their location in his photos. Reil wrapped AM2 in polymeric film. He then stood a cabinet back up and placed AM2 inside the cabinet where he understood AM2 to have been located at the time of the fire. Reil stated that AM1, however, was "a melted mass of orange plastic, some steel handles and the motor itself," and he decided to leave it in its location. When asked why he left AM1 without the polymeric film on it, Reil

replied that it was a judgment call. Reil explained that when he completed his investigation, he had wrapped AM2 for the purpose of collecting it as evidence and intended to do the same with AM1 but that he had then decided that it would be of greater value to other fire investigators and engineers for them to see things in their original location. Reil said that it was also his understanding that there were no more operations taking place at the warehouse. And Reil made sure that the doors to the warehouse were locked when he left that day.

Reil testified that before he left the warehouse, however, he called both Williams's supervisor and Richbourg. Richbourg recounted that when he talked to Reil, Reil told him that the fire was "electrically provoked" and that Reil believed that the cause of the fire had been a fan motor and not anything that the Xterra Defendants had done. Reil stated that during the call, he also instructed Richbourg that no one was to go into the paint room. Richbourg confirmed receiving this directive, stating that Reil instructed him not to go into the finishing room and not to disturb the fire scene. Richbourg was sure that he conveyed the message "accordingly" thereafter.

Reil stated that when he called Williams's supervisor, he advised him that some additional parties needed to be put on notice, including AM1's manufacturer, because those parties would want to inspect the scene. Reil communicated the same thing to Williams herself later that day, and Williams testified that at some point, she did send notice letters to several entities. Reil stated that he also probably would have told Williams, her supervisor, or both of them at that time that there were anomalies on AM1 that he believed were responsible for the fire. Williams testified that she thereafter

communicated to Davis what she had found out from Reil. She wanted Davis to know as soon as possible because she thought Hull would be interested in pursuing Emerson for the faulty fan.

Hull testified that on October 29, 2014, he went back to the warehouse because he was curious and was trying to understand what had happened. He said that he does not know if anyone else was there at the time; he used his key to enter. Although he had already taken several photos on the day of the fire, Hull, once inside, took more photos. He noted that he did not go into the paint room that day; he stood at the threshold of the room to take the photos. Hull then testified that on November 5, 2014, he hired Ryan Johnson to represent the owners of the warehouse. Hull explained that Davis had called him and told him that he was heavily involved in other litigation at the time and recommended that Hull hire Johnson.

Johnson testified that on the morning of November 6, 2014, he spoke with Williams, told her that he was representing the owners of the warehouse, and told her that he expected that there would be a claim on behalf of the owners. Johnson said that he thinks that Williams told him at that time that Cincinnati believed that a fan had caused the fire and that Cincinnati was in the process of trying to notify the fan manufacturer. Johnson asked Williams whether the tenants of the warehouse had secured the scene and whether they understood their obligation to preserve the scene. Johnson said that Williams assured him that Richbourg had ensured her that the tenants had preserved and secured the scene and that Richbourg understood the obligation to preserve the scene. Johnson told Williams that he was nevertheless going to send her a

formal request to preserve the scene. Johnson testified that Williams told him to forward all communications related to the Xterra Defendants and the fire loss to her. Williams then sent Johnson her contact information.

Williams acknowledged that during the call, she assured Johnson that the scene was secured and told him that Cincinnati had had its engineer at the warehouse. Williams also confirmed that she told Johnson that Hull would probably be interested in pursuing "this" because Cincinnati's cause-and-origin engineer had found that the fan motor was the cause of the fire. Williams, however, disputed that Johnson had told her anything during the call about Hull having a claim against the Xterra Defendants. Williams also stated that she never tells an attorney that she is an agent for an insured.

Johnson testified that after his phone call with Williams ended, he met with Hull for the first time. They met at Hull's office, which is not far from the warehouse, and after the meeting, Johnson suggested that he and Hull go by the warehouse. Johnson stated that when he and Hull arrived at the warehouse on November 6, a large trailer with the Xterra Defendants' logos on it was parked outside the building, and a door to the warehouse was open. When Johnson and Hull walked into the area where the fire had occurred, Johnson saw two men sweeping in the middle of the fire scene, including in the location that Reil had identified as the fire's point of origin. Johnson yelled at the workers to stop, which they did. Johnson explained to them that it was a fire scene and that they needed to stop immediately. According to Johnson, one of the workers told him that they were there to clean the entire warehouse. Johnson then asked the workers who had instructed them to be there, and they acknowledged that Richbourg had.

Johnson stated that he then asked if there were any other people there at the warehouse. The workers told him that there was another person. Johnson then saw a third man standing in a commercial-sized dumpster just outside the warehouse, stomping on the debris to compact it. Johnson and Hull went out to the dumpster area. Johnson testified that it was clear that in addition to sweeping the fire scene, the workers were "dumping fire-charred material and paint cans and varnishes and things like that into the dumpster." Hull agreed, testifying that he personally witnessed the workers putting fire-charred debris into the dumpster. Hull stated that the only place that there had been any charred materials was in the room where the fire had occurred and that any charred materials must therefore have come from that room. Johnson stated that the workers eventually moved away from the fire scene, and Johnson then went directly back to his office.

Richbourg acknowledged that some sort of miscommunication had occurred. Richbourg explained that when the fire occurred, the Xterra Defendants had been in the process of setting up a new location to conduct business but that the new location had not yet been operational. After the fire, the Xterra Defendants were then pressed to move their equipment to the new location because they needed to resume the operation of the business. The Xterra Defendants were therefore motivated to bring the warehouse as best as possible to its move-out condition and to retrieve items of value from the warehouse that were important for the continuation of the business.

Marty Schraeder, Venturi's former general manager, testified that on the morning of November 6, he therefore met with several workers at the warehouse. Schraeder told

the workers that they had been allowed to move "good" equipment out of the warehouse and that they needed to salvage what they could salvage. Schraeder, however, denied telling the workers to clean out the entire warehouse. Schraeder stated that he told the workers not to go into the offices and not to go into the room where the fire had occurred. Richbourg testified that before November 6, he had communicated to Schraeder that no one was to go into the area where the fire had occurred. Schraeder stated that he had also been told by someone from the insurance company not to go into the room where the fire had occurred because it was under investigation. Schraeder further explained that there was nothing for the workers to salvage out of the room and that he did not want the workers going in the room because of safety concerns. Schraeder nevertheless acknowledged that he was not at the warehouse all day supervising the workers and agreed that the workers disregarded his instructions about not going into the room where the fire occurred.

Landon Wilkins testified that he was one of the workers at the warehouse on November 6 and that he recalled being told to recover all of the equipment and usable lumber from the warehouse but to stay out of the paint room. Wilkins acknowledged that one of the other workers nevertheless swept a path through the paint room. Wilkins stated that he did not have an understanding of why the worker had done that. Richbourg testified, however, that he asked the workers why they had disturbed the area of the fire's origin and that the workers had told him that they were trying to remove things from a room that was unaffected by the fire and that it was expedient to transport the materials through the room where the fire occurred. Wilkins stated that nothing was

taken out of the paint room though. The only thing that was thrown into the dumpster that day was water-damaged or charred wood.

Johnson testified that when he arrived back at his office, he immediately composed a letter ("the spoliation letter") and emailed it to Williams at 6:18 p.m. on November 6. Johnson also called Williams and left her a voicemail. The spoliation letter states: "You should consider this letter as notice of representation and a notice of claim against your insured …." Johnson testified that he tried to document in the letter what he had seen at the warehouse because what he had seen was contrary to what Williams had represented to him. The spoliation letter states that, based on Johnson's personal observations, the Xterra Defendants "had spoliated large amounts of key evidence, including evidence located in the room in which the fire originated." The spoliation letter then states:

> *We request that you, your agents, servants and representatives secure and protect and do not allow anyone to MOVE, MUTILATE, REPAIR, DESTROY, TRANSPORT, DISPOSE OF, OR CHANGE IN ANY WAY FROM ITS PRESENT CONDITION the Warehouse or any of its contents. We also request that you inform anyone you have employed and/or utilized or directed to retain, store, or control Warehouse or any of its current contents to preserve and protect such evidence for trial. Please preserve and protect said critical and important evidence as described above until all of our client's representatives have had a reasonable opportunity to inspect the said items. We may require that multiple experts inspect and analyze the above-described said items and salvage after our initial inspection. Any change in the condition of said items will be considered spoliation of evidence as that term is defined under Texas Law, and any such action will be presumed to be in violation of this notice letter and subject to penalty under Texas Law.*

On November 9, Williams responded to Johnson's email, stating that she had been sick and out of the office but that she would be back the next day. Johnson replied, stating that he needed confirmation from Williams that she had told the Xterra Defendants to

stop entering the fire scene and to stop removing items from the warehouse. Johnson also wanted to know what happened to "all the fans." On the morning of November 10, Williams responded to Johnson again, stating that she had forwarded his letter to Richbourg and "ha[d] a call into him." Williams stated that she had told Richbourg that he could "take the wood stock and stuff in the front room but they were not to go into the fire room at all" and that Richbourg had assured her that he would convey that message.

Richbourg testified that he became aware that the owners of the warehouse were potentially pursuing a claim against the Xterra Defendants when he received the spoliation letter on November 10. Williams had emailed the spoliation letter to Richbourg at 8:07 a.m. on November 10. Williams testified that that was the only way Richbourg would have received the spoliation letter.

Richbourg testified that when he received the spoliation letter, he returned to the warehouse because he felt responsible to identify what had happened. When he entered the paint room, he observed the change in condition from his previous visit when he had been there with Reil. Richbourg noticed that AM2 was located on the floor adjacent to the swept path through the area and that the wrapping on AM2 had been opened. Richbourg stated that he did not know who had moved AM2 to that location. Richbourg proceeded to put AM2 back up on top of a cabinet. Richbourg explained that he moved AM2 because that is where he understood that Reil had placed it when Reil had finished his inspection. Richbourg said that he was just trying to restore AM2 to its original location. Richbourg also got into the dumpster at the warehouse and looked for evidence

of any materials that would have been in the room of the fire's origin. Although there was a significant amount of material in the dumpster, Richbourg could not find any materials from the room of the fire's origin. Richbourg found only material from other areas of the warehouse.

After Richbourg left the warehouse, he emailed Williams, notifying her that he had found AM2 on the floor about ten feet from its original location and that he had restored AM2 to its original location. Richbourg also acknowledged in his email to Williams that the workers had "broomed a path through the finishing room so they could roll carts of materials out the door" and that that had not been a good idea. Richbourg reported to Williams, however, that upon inspection of the dumpster, he found it evident that none of the material was removed from the finishing room. Richbourg also reported that he had taped the area off with caution tape as of that morning. Williams replied that she had advised Johnson that the lease terminated on November 14, 2014 and that Hull needed to get his investigator out to the warehouse for his own investigation.

Reil testified that on November 12, 2014, he finally visited the fire scene with Joe Ellington, Hull's cause-and-origin expert, who was going to inspect the scene. Ellington stated that he had actually been to the warehouse on November 11, 2014 with Hull, who then left him there alone for about an hour and a half. Ellington spent time sketching, measuring, and taking notes. He did not touch or move anything in the paint room. Ellington then left the warehouse and locked the door.

Reil testified that on November 12, he noticed that the fire scene had been significantly altered since October 23. Two wall fans had been removed. The area that

Reil had identified as the point of origin of the fire had been swept. Reil stated, however, that he did not consider that alteration of the scene to be very serious. Similarly, AM2 had been moved. But again, Reil stated that he did not think that that would have an impact on anyone's investigation of the scene. The scene had been altered, however, in a way that Reil considered to be very serious—AM1 had been removed from the scene.

No one knows what happened to AM1. It remains missing. Reil testified that he received a photo that was taken by Hull on October 29. According to Reil, the photo shows the motor of AM1 missing; therefore, Reil believes that AM1 may have been moved before the Xterra Defendants swept the scene. Reil testified that one of the "roll-up" doors in the October 29 photo was in a different condition than it had been when he was there on October 23. When asked if Reil was saying that someone burglarized the warehouse between October 23 and October 29, he replied, "I'm saying that's a candidate." Similarly, Richbourg testified that all types of metal in the warehouse had disappeared since the fire; therefore, he speculated that AM1 was pilfered along with the other metal.

Both Johnson and Wilkins testified that they did not see AM1 at the warehouse on November 6. But Johnson stated that it appeared to him that AM1 could be seen in both the October 23 photo and the October 29 photo. Johnson explained that based on his experience, it therefore seems obvious that representatives of the Xterra Defendants swept up and threw away AM1. Ellington agreed, stating that it is more probable that the Xterra Defendants had already started sweeping and moving the area and accidentally swept up AM1 as part of that process than that AM1 was stolen. Ellington

stated that in any event, he cannot conclusively determine the cause of the fire because the "most vital piece of evidence" is no longer available to be evaluated.

## Procedural Background

Hull and William H. Beazley, III, as executor of the William H. Beazley, Jr., estate[1] and as co-trustee of the Bertie Lea Beazley 1998 Family Trust, (collectively, Hull and Beazley) filed suit against the Xterra Defendants, asserting negligence and breach-of-contract causes of action against them. The Xterra Defendants subsequently filed a motion for leave to designate Emerson as a responsible third party. Hull and Beazley amended their petition and added Emerson as a defendant.

Hull and Beazley then filed a motion for sanctions against the Xterra Defendants for spoliation of evidence. After several evidentiary hearings in which Emerson also participated, the trial court signed an order granting the motion for sanctions. The trial court made the following findings:

(1) that the Xterra Defendants collectively had a duty to reasonably preserve the fire scene and all articles at the fire scene because: (a) the Xterra Defendants were the sole occupiers of the warehouse building at the time of the fire; and (b) the Xterra Defendants knew or reasonably should have known that there was a substantial chance that a claim would be filed and that evidence in its possession or control would be material and relevant to that claim;

(2) that the Xterra Defendants spoliated the fire scene and artifacts at the fire scene, including without limitation: (a) the point of origin of the fire; (b) the air mover previously located at the point of origin of the fire that the Xterra Defendants allege to have caused the fire; and (c) fire debris located at the point of origin of the fire; and

---

[1] Hull testified that Beazley, Jr., passed away on September 20, 2014.

(3) that Plaintiffs [Hull and Beazley] and Emerson Defendants have been deprived by the Xterra Defendants' spoliation of certain evidence (including the air mover previously located at the point of origin of the fire that Xterra Defendants allege to have caused the fire and fire debris located at the point of origin of the fire) of any meaningful ability to present evidence concerning the "causation" element of Plaintiffs' [Hull's and Beazley's] and Emerson Defendants' claims and defenses.

The trial court then ordered the following:

(1) the portion of the Xterra Defendants' Second Amended Original Answers, Special Exceptions and Counterclaims denying the causation element of Plaintiffs' [Hull's and Beazley's] claims against the Xterra Defendants is hereby stricken;

(2) the portion of the Xterra Defendants' Second Amended Original Answers, Special Exceptions and Counterclaims in which the Xterra Defendants designate Emerson Tool Company a/k/a Emerson Commercial & Residential Solutions as a responsible third party is hereby stricken;

(3) this Court will issue a spoliation instruction to the jury as to the causation element of Plaintiffs' [Hull's and Beazley's] claims against the Xterra Defendants consistent with the Texas Pattern Jury Charge – Business 100.13 (2014). This Court will prepare the spoliation instruction after the close of evidence in this case and include the spoliation instruction in the Charge to be presented to the Jury;

and

(4) Plaintiffs [Hull and Beazley] are hereby awarded $40,973.50 for reasonable attorney's fees and expenses related to the filing of PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE and hearing on the same;

and

(5) Emerson Defendants are hereby awarded $20,000.00 for reasonable attorney's fees and expenses related to the filing of PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE and hearing on the same.

The Xterra Defendants subsequently filed this original proceeding, seeking mandamus relief to vacate the trial court's order imposing sanctions against them for the spoliation of evidence. *See* TEX. R. APP. P. 52. The Xterra Defendants also filed a motion for stay pending disposition of their mandamus petition. *See id.* R. 52.10(a). We granted the motion for stay and ordered that the trial court's order and any trial setting in the underlying case be stayed pending further order of this Court. *See id.* R. 52.10(b). We also requested a response to the petition for writ of mandamus. *See id.* R. 52.8(b). Hull and Beazley filed a response; Emerson and Respondent did not.

## Mandamus Standard

Mandamus is an extraordinary remedy, available only in limited circumstances. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). To obtain mandamus relief, a relator must show both that the trial court has clearly abused its discretion and that the relator has no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135-36 (Tex. 2004) (orig. proceeding).

## Clear Abuse of Discretion

We begin with whether the Xterra Defendants have shown that the trial court clearly abused its discretion in imposing sanctions against them for the spoliation of evidence. *See id.* at 135.

> In *Brookshire Brothers*, [*Ltd. v. Aldridge*, 438 S.W.3d 9 (Tex. 2014), the Texas Supreme Court] adopted a framework governing the imposition of remedies for evidence spoliation. [The supreme court] explained that whether a party spoliated evidence and whether a particular remedy is appropriate are questions of law for the trial court. *Id.* at 20. . . . [The court] further held in *Brookshire Brothers* that, to find that spoliation occurred, the trial court must make affirmative determinations as to two elements. First,

the party who failed to produce evidence must have had a duty to preserve the evidence.  *Id. . . .*  "Such a duty arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim."  *Id.* (citation and internal quotation marks omitted).  Second, the nonproducing party must have breached its duty to reasonably preserve material and relevant evidence.  *Id.*  A party cannot breach its duty to preserve without at least acting negligently.  *Id.* at 20-21 & n.8.

*Petroleum Solutions, Inc. v. Head*, 454 S.W.3d 482, 488 (Tex. 2014).

Based on *Brookshire Brothers*, the first matter that we must address then is whether the Xterra Defendants had a duty to preserve the evidence at the fire scene.  *See id.*

### Hull and Beazley

Any duty to Hull and Beazley that the Xterra Defendants had to preserve evidence at the fire scene would have arisen only when the Xterra Defendants knew or reasonably should have known that there was a substantial chance that Hull and Beazley would file a claim against them and that evidence in their possession or control would be material and relevant to that claim.  *See id.*  The Xterra Defendants contend that any duty that they had was therefore not triggered until "after the disappearance of AM1 as well as the sweeping incident."  Hull and Beazley disagree and argue that the Xterra Defendants' duty arose immediately after the fire occurred.

The record here shows that the earliest that the Xterra Defendants *actually knew* that there was a substantial chance that a claim would be filed against them by Hull and Beazley was when Richbourg received Williams's email containing the spoliation letter on the morning of November 10, 2014.  Richbourg, the sole owner of Xterra and Venturi, testified that that is when he became aware that the owners of the warehouse were

potentially pursuing a claim against the Xterra Defendants, and no other testimony indicates otherwise. Hull testified that all of his communication about the issue went through Davis and Johnson. Davis did not testify at the spoliation hearing, and Johnson testified that he did not know whether Davis had provided notice to anyone that there would be a claim. Johnson stated that he told Williams (not the Xterra Defendants) on the morning of November 6, 2014, that he expected that there would be a claim on behalf of the owners, and Johnson then emailed the spoliation letter to Williams (not the Xterra Defendants) on November 6. Williams did not email the spoliation letter to Richbourg until 8:07 a.m. on November 10, and Williams testified that that was the only way Richbourg would have received the spoliation letter.

Hull and Beazley argue that the Xterra Defendants nevertheless *reasonably should have known* much sooner than November 10 that there was a substantial chance that a claim would be filed. Hull and Beazley first contend that the very nature of the event would cause a reasonable person to anticipate that claims would be filed. They assert that this case is similar to *In re J.H. Walker, Inc.*, No. 05-14-01497-CV, 2016 WL 819592 (Tex. App.—Dallas Jan. 15, 2016, orig. proceeding) (mem. op.), a case involving a motor vehicle accident. In *J.H. Walker*, the court noted that in some circumstances, it is possible that a reasonable person would conclude from the severity of an accident and other circumstances that a substantial chance of litigation will ensue. *Id.* at *5; *see also In re Advanced Powder Solutions, Inc.*, 496 S.W.3d 838, 854 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding) (citing *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003)). The *J.H. Walker* court then concluded that based on the record as a whole, including the

severity of the crash, which included a fatality, the relator had a duty to preserve the wrecked vehicle. *J.H. Walker*, 2016 WL 819592, at *6.

The present case is, however, distinguishable from *J.H. Walker*. Hull and Beazley argue that "this case involves serious circumstances in which a commercial [w]arehouse worth hundreds of thousands of dollars was significantly damaged by fire." But this case does not involve a fatality or severe personal injury. Instead, this case involves property damage. Furthermore, the evidence indicates that the damage was confined to one room of the warehouse, not the entire warehouse. Accordingly, the evidence does not support that a reasonable person would conclude from the severity of the fire or extent of the damages that a substantial chance of litigation would ensue between Hull and Beazley and the Xterra Defendants.

Hull and Beazley next argue that from the moment that the fire occurred, the Xterra Defendants should have been aware of their duty to preserve the fire scene because they were the sole tenants and occupiers of the warehouse and the sole owners of the personal property located in the area of the fire's origin and because the language of the lease and guaranty make the Xterra Defendants responsible for any property damage to the warehouse. The lease term, however, was to end on November 14, 2014, and the lease required the Xterra Defendants to return the warehouse to Hull and Beazley in the same condition as it was at the beginning of the lease, except for normal wear and tear. Yet Hull, who was at the warehouse as early as the day of the fire and continued to visit the warehouse thereafter, never indicated to the Xterra Defendants that there was a substantial chance that a claim would be filed or that the Xterra Defendants needed to

preserve the fire scene. Nor is there any evidence that Davis indicated that there was a substantial chance that a claim would be filed or that the Xterra Defendants needed to preserve the fire scene, even when Williams contacted him. Accordingly, the evidence does not support that a reasonable person would conclude that a substantial chance of litigation would ensue between Hull and Beazley and the Xterra Defendants just because of the lease. *See Brookshire Bros.*, 438 S.W.3d at 20 ("[A] 'substantial chance of litigation' arises when 'litigation is more than merely an abstract possibility or unwarranted fear.'").

Finally, Hull and Beazley argue that immediately after the fire occurred, the Xterra Defendants should have been aware of their duty to preserve the fire scene because they pursued their own insurance claim within forty-eight hours of the fire, Reil and Williams instructed Richbourg to preserve the scene, and Richbourg made a commitment to do so. Richbourg making a claim with Cincinnati for Venturi's personal property that was lost or damaged by the fire does not, however, equate to Richbourg having knowledge of a substantial chance of a claim being filed by Hull and Beazley against the Xterra Defendants. As stated above, Hull and Beazley point out that the Xterra Defendants were the sole tenants of the warehouse and the sole owners of the personal property in the warehouse at the time of the fire. As owners of personal property in the warehouse, it follows that a fire in one of the rooms of the warehouse would cause damage to the Xterra Defendants. But it does not follow that there would be a substantial chance that a claim would be filed by Hull and Beazley, who did not have personal property in the warehouse, against the Xterra Defendants. This is especially true given the fact that neither Hull nor Davis indicated to the Xterra Defendants that there was a substantial

chance that a claim would be filed or that the Xterra Defendants needed to preserve the fire scene.

Based on the foregoing, we conclude that the Xterra Defendants did not know, nor reasonably should they have known, that there was a substantial chance that a claim would be filed by Hull and Beazley against them until Richbourg received Williams's email containing the spoliation letter on the morning of November 10, 2014. Furthermore, there is no dispute that by the morning of November 10, 2014, the fire scene had been swept and AM1 was gone. Accordingly, we conclude that by the time the Xterra Defendants knew or reasonably should have known that there was a substantial chance that a claim would be filed by Hull and Beazley against them, the fire scene no longer contained evidence that would be material and relevant to that claim. Therefore, the Xterra Defendants did not have a duty to Hull and Beazley to preserve any evidence from the fire scene. *See Petroleum Solutions*, 454 S.W.3d at 488.

### *Emerson*

Emerson's relationship with the Xterra Defendants is different than Hull's and Beazley's relationship with them. Emerson has not filed any claim against the Xterra Defendants, and the Xterra Defendants have not filed any claim against Emerson. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(i) ("The filing or granting of a motion to designate a person as a responsible third party or a finding of fault against the person: (1) does not by itself impose liability on the person; and (2) may not be used in any other proceeding, on the basis of res judicata, collateral estoppel, or any other legal theory, to impose liability on the person."). Instead, Hull and Beazley have filed a claim against

Emerson, and the issue is whether the Xterra Defendants had a duty to preserve the evidence at the fire scene for Emerson against Hull and Beazley.

We assume without deciding that, under the right circumstances, the Xterra Defendants could have a duty to preserve the evidence at the fire scene for Emerson against Hull and Beazley. Any such duty would have arisen only when the Xterra Defendants knew or should have known that there was a substantial chance that Hull and Beazley would file a claim against Emerson and that evidence in the Xterra Defendants' possession or control would be material and relevant to that claim. *See Petroleum Solutions*, 454 S.W.3d at 488.

There is no indication in the record here that the Xterra Defendants knew or reasonably should have known that there was a substantial chance that a claim would be filed by Hull and Beazley against Emerson before the morning of November 10, 2014 when the Xterra Defendants knew or reasonably should have known that there was a substantial chance that a claim would be filed by Hull and Beazley against them. *See Brookshire Bros.*, 438 S.W.3d at 20 ("[A] 'substantial chance of litigation' arises when 'litigation is more than merely an abstract possibility or unwarranted fear.'"). Furthermore, as stated above, there is no dispute that on the morning of November 10, 2014, the fire scene had been swept and AM1 was gone. Accordingly, we conclude that by the time the Xterra Defendants knew or reasonably should have known that there was a substantial chance that a claim would be filed by Hull and Beazley against Emerson, the fire scene no longer contained evidence that would be material and relevant to that claim. Therefore, the Xterra Defendants did not have a duty to preserve any evidence

from the fire scene for Emerson against Hull and Beazley. *See Petroleum Solutions*, 454 S.W.3d at 488. Moreover, in light of the foregoing, we conclude that the trial court clearly abused its discretion in its imposition of sanctions against the Xterra Defendants for the spoliation of evidence. *See id.*

### No Adequate Remedy by Appeal

We now turn to whether the Xterra Defendants have shown that they have no adequate remedy by appeal. *See Prudential*, 148 S.W.3d at 135-36.

Generally, orders imposing discovery sanctions, including spoliation instructions, are reviewable on appeal from the final judgment. TEX. R. CIV. P. 215.3; *see also Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam) (review of decision to submit or refuse a particular instruction on appeal is under abuse-of-discretion standard); *Wal-Mart Stores*, 106 S.W.3d at 724 (spoliation jury instruction imposed as discovery sanction reviewed on appeal). On the other hand, when a trial court imposes sanctions that have the effect of adjudicating a dispute, whether by striking pleadings, dismissing an action, or rendering a default judgment, but the imposition of the sanctions does not result in rendition of an appealable judgment, then the eventual remedy by appeal is inadequate. *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 919 (Tex. 1991). Sanctions that have the effect of adjudicating a claim or precluding a decision on the merits of the case are referred to as "death penalty" sanctions. *In re First Transit Inc.*, 499 S.W.3d 584, 591 (Tex. App.—Houston [14th Dist.] 2016, orig. proceeding) (citing *GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 732 (Tex. 1993)).

The Xterra Defendants contend that the trial court ordered death penalty sanctions in this case. Not only did the trial court decree that it will issue a spoliation instruction to the jury as to the causation element of Hull's and Beazley's claims against the Xterra Defendants, the trial court also ordered that the portion of the Xterra Defendants' pleadings denying the causation element of Hull's and Beazley's claims against them is stricken and that the portion of the Xterra Defendants' pleadings in which they designate Emerson as a responsible third party is stricken.

Hull and Beazley argue that the striking of the Xterra Defendants' causation defenses related to Hull's and Beazley's breach-of-contract and negligence claims is not tantamount to death penalty sanctions because Hull and Beazley must still prove the remaining elements of their breach-of-contract and negligence claims to prevail at trial. We disagree. The trial court here imposed sanctions that adjudicated any dispute regarding causation in this case; therefore, we conclude that the Xterra Defendants' eventual remedy by appeal is inadequate. *See TransAmerican*, 811 S.W.2d at 919.

## Conclusion

For the foregoing reasons, we conclude that the trial court clearly abused its discretion in imposing sanctions against the Xterra Defendants for the spoliation of evidence. The Xterra Defendants also have no adequate remedy by appeal. Accordingly, we lift our stay of the proceedings in the trial court and conditionally grant the Xterra Defendants' petition for writ of mandamus. A writ will issue only if Respondent fails to vacate the "Order on Motion for Sanctions for Spoliation of Evidence" that was signed

on November 22, 2016, and to notify this Court in writing that it has done so within seven days from the date of this opinion.

REX D. DAVIS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Senior Justice Scoggins[2]
      (Chief Justice Gray dissenting with opinion)
Petition granted
Opinion delivered and filed May 15, 2019
[OT06]



---

[2] The Honorable Al Scoggins, Senior Justice of the Tenth Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. §§ 74.003, 75.002, 75.003.