

# NUMBER 13-22-00389-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE SOUTHWESTERN PUBLIC SERVICE COMPANY, XCEL ENERGY, INC., AND XCEL ENERGY SERVICES, INC.

### On Petition for Writ of Mandamus.

## MEMORANDUM OPINION

**Before Justices Benavides, Silva, and Peña**
**Memorandum Opinion by Justice Benavides[1]**

By petition for writ of mandamus, relators Southwestern Public Service Company, Xcel Energy Inc., and Xcel Energy Service Inc., contend that the trial court abused its discretion by issuing death penalty sanctions against them for a second time.[2] The trial court first issued an order granting death penalty sanctions against the relators on

---

[1] *See* TEX. R. APP. P. 52.8(d) ("When denying relief, the court may hand down an opinion but is not required to do so. When granting relief, the court must hand down an opinion as in any other case."); *see also id.* R. 47.4 (distinguishing opinions and memorandum opinions).

[2] This original proceeding arises from trial court cause number C-4964-16-I in the 398th District Court of Hidalgo County, Texas, and the respondent is the Honorable Keno Vasquez. *See id.* R. 52.2.

February 19, 2019, and this Court conditionally granted the relators' petition for writ of mandamus and directed the trial court to set aside that order. *In re Sw. Pub. Serv. Co.*, No. 13-19-00111-CV, 2020 WL 1887762, at *30 (Tex. App.—Corpus Christi–Edinburg Apr. 16, 2020, orig. proceeding) (mem. op.).

On June 16, 2022, the trial court signed the *second* death penalty sanction order at issue in this case, the "Order Striking Pleadings of [Relators] and Entry of Default Judgment on Ordinary Liability." The relators contend that the trial court abused its discretion in doing so. We agree, and accordingly, we conditionally grant the petition for writ of mandamus.

## I.    BACKGROUND

The genesis for this lawsuit and the events surrounding the first death penalty sanction can be found in our previous memorandum opinion, and we will not reiterate those events here except as necessary for the disposition of this original proceeding. *See id.* at *1–30. In short, Eduardo Munoz Jr. suffered severe personal injuries from an electrical arc arising from a high voltage power line that was owned and operated by the relators. At the time of the incident, Munoz was on top of a trailer attempting to manually roll a tarp over a load of peanuts when the metal crank arm which rolled the tarp either came in contact with or came into extreme proximity to the power line, thereby creating the electrical arc that caused Munoz's injuries. Wilco Peanut Co., Ltd. (Wilco) had hired Munoz to pick up peanuts and deliver them to its peanut processing facility. Marco Sustayta, a Wilco employee or independent contractor, had dispatched Munoz to retrieve peanuts from a peanut farm owned or operated by Dustin Nelson. The real parties in

2

interest, Munoz and his family,[3] filed suit against Wilco, Sustayta, Nelson, and the relators. The real parties settled their claims against Wilco and Nelson and dismissed their claims against Sustayta. The relators have filed a motion to designate Sustayta as a responsible third party; however, the trial court has not yet ruled on that motion.

As stated previously, during the litigation, the trial court issued death penalty sanctions against the relators, and we concluded that the first death penalty sanction failed to comply with the governing law. *See id.* We thus conditionally granted the relators' petition for writ of mandamus. *Id.* In accordance with our directions, the trial court vacated the first death penalty sanction on May 13, 2020. The case was thereafter quiescent for a substantial period. On April 8, 2021, the real parties filed a motion for additional findings and a renewed request for death penalty sanctions against the relators. The real parties argued that this Court's memorandum opinion had approved the trial court's "methodology and procedure" for conducting the hearing on death penalty sanctions and that we had upheld "relevant" findings that the trial court had made in imposing the first death penalty sanction. According to the real parties, our opinion was "replete with numerous and specific references in full and unequivocal support" of the trial court's death penalty sanction. The real parties thus urged the trial court to review the record and reissue death penalty sanctions without allowing the relators to introduce any additional evidence regarding sanctions.

On April 27, 2021, the relators filed a response to the real parties' motion for additional findings and their renewed request for death penalty sanctions. In their

---

[3] The real parties include Eduardo Munoz Jr. and Kasandra Girela Munoz, individually and as next friend to their minor child.

3

response, the relators argued that our memorandum opinion indicated that death penalty sanctions were improper and requested the trial court to refuse to reissue death penalty sanctions and instead to allow the case to proceed to trial. Alternatively, if the trial court was considering assessing sanctions, the relators requested the trial court allow them to present additional evidence and witnesses.

On April 28, 2021, the trial court held a status conference at which the parties discussed their divergent interpretations of our memorandum opinion and how to proceed with the real parties' renewed motion for death penalty sanctions. The trial court instructed the parties to discuss various pending issues, such as whether the real parties would seek sanctions against the relators' counsel and requested the parties work together to "set parameters" regarding any proposed testimony and witnesses.

On May 5, 2021, the trial court held another status conference. The trial court and parties again discussed their interpretations of our opinion. The real parties asserted that the trial court need not hold any additional evidentiary hearings in order to assess death penalty sanctions for a second time. The trial court reiterated his displeasure with the relators' discovery responses and expressed his disagreement with certain portions of our memorandum opinion.

On May 12, 2021, the relators advised the trial court that they intended to show that the real parties' "sag" theory was impossible and that they planned to present Corby White and David Wheeler to testify, and the scope of their testimony was identified in the offers of proof and the affidavits that the relators previously provided in an offer of proof.

The hearing on the real parties' request for new death penalty sanctions was set for July 22, 2021. However, on May 21, 2021, the relators filed an emergency application

4

for a continuance of the hearing on grounds that their counsel was unavailable. Subsequently, the parties agreed to reset the hearing until August 5, 2021.

On July 30, 2021, the real parties filed an emergency motion for continuance of the hearing. According to their motion, on July 20, 2021, the relators filed supplemental discovery responses "and produced several thousand pages of documents, photographs and videos, all of which were not previously produced," and the relators "also amended the disclosures regarding the scope of expert testimony for David Wheeler, Corby White, and Kenneth Munsell." The real parties sought a continuance of the hearing, then scheduled for August 5, 2021, "in order to allow [them] the opportunity to review this newly-disclosed information."

On October 5, 2021, the real parties filed a "supplement" to their motion for death penalty sanctions asserting that the relators had "continue[d] their pattern of egregious discovery abuse." The real parties asserted that the relators' supplemental discovery responses included new expert opinions for Munsell, Wheeler, and White "*almost three years past the deadline* for designating experts" and that the relators had produced "approximately 4[,]000 additional pages of documents." The real parties asserted that this discovery was related to the relators' "new" theory regarding the cause of the accident concerning a grounded guy wire;[4] however, the real parties also argued that the guy wire theory related to claims previously made by the relators. The real parties recounted the history of the case, as discussed in our previous memorandum opinion, and argued that:

---

[4] The relators posit that a grounded guy wire located underneath the powerline exceeded the estimated height of Munoz's tarp rod at the time of the accident, and that if the powerline had sagged as the real parties contend, the powerline would have contacted the guy wire and tripped a breaker before it came into contact with the tarp rod.

5

(1) the relators took aerial photographs in support of the guy wire theory on May 4, 2021; (2) White took photographs regarding the guy wire theory on June 11, 2021; (3) the relators provided new expert disclosures and supplemental responses on July 20, 2021; and (4) the relators produced an animation and additional photographs regarding the new theory on August 2, 2021. The real parties did not otherwise describe the relators' supplemental discovery responses other than it "appears to possibly include even more [Supervisory Control and Data Acquisition Control System (SCADA)] data."

On October 7, 2021, the trial court held a "supplemental" evidentiary hearing on the real parties' motion to reimpose death penalty sanctions. The trial court heard testimony from Wheeler and White, who addressed relators' preservation of data and the alleged prejudice that the real parties claimed to suffer due to the missing data. They testified, in short, that the events on the powerline could be modeled without the missing data and that a grounded guy wire would have prevented the powerline from sagging as the real parties claimed. The parties thereafter provided additional briefing. On November 19, 2021, the relators filed a motion to reopen evidence on the real parties' motion for sanctions. The relators' motion to reopen the evidence discussed the guy wire theory in detail and stated that White had performed additional investigation in support of this theory based on the testimony, examination, and cross examination that had occurred at the hearing on October 7, 2021. The relators requested the trial court to admit White's resulting declaration and the photographs into evidence. On December 28, 2021, the real parties filed an objection and response to the relators' motion to reopen evidence. The trial court nevertheless granted the relators' motion. On June 16, 2022, the trial court

6

signed the second order granting death penalty sanctions. The relators moved for reconsideration, which the trial court denied.

We briefly review the salient provisions of the trial court's second death penalty order. The trial court's order is seventy-five pages long and is based, almost entirely, on the same events that gave rise to the first death penalty sanction and which we discussed in our memorandum opinion. The trial court again sanctioned relators based on the failure of Maria Vasquez to provide additional testimony, *see In re Sw. Pub. Serv. Co.*, 2020 WL 1887762, at *6, relators' failure to preserve SCADA data, the Sequence of Events (SOE) log, and the Schweitzer relay data,[5] *see id.* at *14–18, Munsell's affidavit, *see id.* at *18, the "false" and "misleading" testimony and discovery responses provided by relators' witnesses, *see id.* at *17–20, Cory Wood's testimony regarding repair records, *see id.* at *19, and the failure to identify Cory Beauchamp, *see id.* at *19. The trial court concluded that relators intentionally misled their own outside counsel and the real parties to obtain favorable rulings, that the relators' explanations for their discovery abuses were also false and misleading, and that their "non-credible explanations" were "further evidence" that the relators committed discovery abuse deliberately. The trial court again concluded that the relators "destroyed key evidence" and that this "irrevocably and materially hampered and harmed" the real parties' ability to establish liability and gross negligence.

The trial court further found that the relators' "abuse has continued and persisted" after the original death penalty sanction and that the relators had "committed additional and new discovery abuse." The court noted that

---

[5] The Schweitzer relay is part of the relators' system which senses faults, trips breakers, and has the capacity to store data.

without a motion seeking leave of Court, or providing any meritorious excuse or justification whatsoever, [relators] belatedly produced secreted written investigatory field notes, and relevant photographs of the powerline transmission system components and structures in the specific vicinity of the subject incident, or adjacent thereto, a mere 15 days before this matter was set for hearing on August 5, 2021.

The trial court found that relators "deliberately and willfully waited" until days before the scheduled August 2021 supplemental evidentiary hearing to "dump upon the [real parties] *thousands of pages of new materials* that, in some cases, [they] had for years prior to the supplemental evidentiary sanctions hearing." The trial court concluded that the "ongoing" discovery abuse included the relators' "attempt to ambush" the real parties "with a new and fully articulated, but undisclosed 'guy wire' theory." The trial court concluded that the relators "deliberately withheld production of photographs" taken on May 4, 2021, regarding the guy wire and guy pole, but not produced until July 20, 2021, and other photographs taken on June 11, 2021, but not produced until August 2, 2021. According to the trial court, the relators failed to timely produce this evidence to their outside counsel, "which resulted in the inability of the [the relators] to either properly seek a motion for leave, for good cause, to supplement the untimely supplementation, or to otherwise present adequate justification to the Court to excuse this failure."

The trial court stated that it had conducted a supplemental evidentiary hearing allowing the relators to adduce testimony "in support of [their] burden to prove scientific impossibility" and to prove that the real parties' theory of the accident was impossible. The trial court heard testimony from White and Wheeler and concluded that the relators did not prove that the real parties' "sag theory" was scientifically impossible. The trial court concluded that this testimony was "not credible" based in part upon the fact that the

8

testimony was elicited "through the repeated use of impermissible leading questions" and was based on the unproven assumption that all of the relators' protective equipment and processes were properly functioning at the time of the accident. According to the trial court, this testimony lacked scientific basis and was "inherently unreliable." The court noted that one of the relators' photographs showed "what could be evidence of contact" between the transmission line and the guy wire at the spot where contact would have occurred had the powerline sagged as postulated by the real parties yet the relators "failed to prove" this conduct did not occur.

The trial court stated that the relators, "in their efforts to prove scientific impossibility," also generated a model regarding the cause of the accident which obviated the need for some of the missing data. However, the trial court "found that the model is materially unreliable" and that the relators "failed in their attempt to prove scientific impossibility, not only by use of the model but in any other evidentiary submission." In short, "[t]he efficacy of the model was not an absolute proof of scientific impossibility."

The court concluded "that issuance of lesser sanctions in this case, given the wide ranging and persistent discovery abuse at issue": (1) would not "justly or sufficiently punish" the relators; (2) would not deter other litigants from committing similar abuses; and (3) "would likely be viewed as an invitation for other litigants to attempt such discovery abuse." The court further concluded that the relators' additional discovery responses "would be untrustworthy and unreliable." The court thus considered and rejected lesser sanctions in favor of striking the pleadings. The court found that jury instructions, for instance, would cause complication and confusion with regard to assessing the relative

9

responsibilities of the parties, and that adverse jury instructions would cause jury speculation and confusion. Finally, the order states in its decretal provisions that:

> IT IS, THEREFORE, ORDERED ADJUDGED AND DECREED that [Real Parties'] Motion to Strike the Pleadings of [Relators] Pursuant to Texas Rule of [Civil[ Procedure Rule 215.2(b)(5) and Inherent Power to Sanction, and for Entry of Default Judgment is hereby GRANTED, and the [relators'] pleadings, as to [real parties'] claims for ordinary liability and compensatory damages, including all defenses, counter-claims, and cross-claims, except for contribution claims amongst the [relators], are HEREBY STRICKEN.

> IT IS FURTHER, ORDERED, ADJUDGED AND DECREED that a judgment of default be entered in favor of [real parties] and against the [relators] on all issues of ordinary liability as to [real parties'] claims for compensatory damages.

> IT IS FURTHER, ORDERED, ADJUDGED AND DECREED that each of the [relators] shall be jointly and severally liable for any judgment entered for [real parties'] compensatory damages, and no issues of proportionate liability of the [real parties], non-[relators], or other alleged responsible third parties shall be submitted to the finder of fact.

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this case shall proceed to trial by jury as to the issues of the amount of the [real parties'] compensatory damages, if any, only and that no issues with regard to liability, including liability, shall be submitted to the jury.

> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that a full settlement credit for all settlement received by [real parties] shall be applied to the jury's verdict on the amount of [real parties'] compensatory damages.

> IT IS FURTHER, ORDERED, ADJUDGED AND DECREED that none of the relief ordered herein shall operate to preclude the [real parties] from seeking any other available additional and further relief from the Court in the future.

(Footnote omitted). A footnote in the order states that the relators' claims against other parties have already been disposed of by summary judgment.

This original proceeding ensued. In their petition for writ of mandamus, the relators raise three issues with subparts: (1) the second death penalty order contains the same

10

core errors identified by this Court as an abuse of discretion in the prior memorandum opinion because it still (a) precludes the application of proportionate responsibility rules, which this Court held creates an impermissible potential windfall for the real parties, (b) rests on the same evidentiary record that this Court held failed to show that a "significant part of the alleged sanctionable conduct" can "be attributed solely to" the relators, and (c) fails to demonstrate that no lesser sanctions will suffice, especially when no lesser sanctions have even been attempted in the more than two years since the opinion; (2) real parties failed their burden to prove sufficient culpability and prejudice to warrant death penalty sanctions, when (a) there is no evidence that any destruction or failure to preserve data was done with the intent to prevent the data's use in this case, (b) there is ample other evidence available to show what happened on the day of the accident, and (c) no trial date has been set; and (3) the relators lack an adequate remedy by appeal from death penalty sanctions that adjudicate their liability and deny them their statutory right to a determination of proportionate responsibility. The real parties have filed a response to the petition for writ of mandamus in support of the second death penalty sanction. The relators have filed a reply in support of their request for relief.

## II.    MANDAMUS

Mandamus is an extraordinary and discretionary remedy. *See In re Allstate Indem. Co.*, 622 S.W.3d 870, 883 (Tex. 2021) (orig. proceeding); *In re Garza*, 544 S.W.3d 836, 840 (Tex. 2018) (orig. proceeding) (per curiam); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 138 (Tex. 2004) (orig. proceeding). The relator must show that: (1) the trial court abused its discretion; and (2) the relator lacks an adequate remedy on appeal. *In re USAA Gen. Indem. Co.,* 624 S.W.3d 782, 787 (Tex. 2021) (orig. proceeding); *In re*

11

*Prudential Ins. Co. of Am.*, 148 S.W.3d at 135–36; *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex. 1992) (orig. proceeding).

"A sanctions order is subject to review on appeal from the final judgment, TEX. R. CIV. P. 215.3, but, under certain circumstances, is subject to review before final judgment by writ of mandamus." *In re Garza*, 544 S.W.3d at 840. A party's remedy by appeal is inadequate "when a trial court imposes discovery sanctions which have the effect of precluding a decision on the merits of a party's claims—such as by striking pleadings, dismissing an action, or rendering default judgment." *TransAm. Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 920 (Tex. 1991) (orig. proceeding).

### III.    SANCTIONS

We review a trial court's ruling on a motion for sanctions for abuse of discretion. *Altesse Healthcare Sols., Inc. v. Wilson*, 540 S.W.3d 570, 573 (Tex. 2018) (per curiam); *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). There must be a direct relationship between the offensive conduct and the sanction imposed, and the sanction imposed must not be excessive. *Altesse Healthcare Sols., Inc.*, 540 S.W.3d at 574; *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 184 (Tex. 2012); *TransAm. Nat. Gas Corp.*, 811 S.W.2d at 917. A sanction may be issued to: (1) secure compliance with discovery rules; (2) deter other litigants from similar misconduct; and (3) to punish transgressors. *See Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 884 (Tex. 2017); *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992) (orig. proceeding).

A death penalty sanction is one under which "the offending party essentially loses the case because of the sanction." *Altesse Healthcare Sols., Inc.*, 540 S.W.3d at 572. "Any sanction that is case-determinative may constitute a death penalty sanction."

12

*Duncan v. Park Place Motorcars, Ltd.*, 605 S.W.3d 479, 487 (Tex. App.—Dallas 2020, pet. withdrawn). Thus, orders that strike a pleading, dismiss an action, render default judgment, adjudicate a claim, or otherwise preclude the presentation of the merits constitute death penalty sanctions. *Martinez Jardon v. Pfister*, 593 S.W.3d 810, 826 (Tex. App.—El Paso 2019, no pet.). Because there are constitutional limitations on prohibiting a party from presenting the merits of its case, "a death-penalty sanction cannot be used to adjudicate the merits of claims or defenses unless the offending party's conduct during discovery justifies a presumption that its claims or defenses lack merit." *Paradigm Oil, Inc.*, 372 S.W.3d at 184.

## IV. ANALYSIS

In their first issue, the relators assert that the second death penalty sanction order contains the same "core errors" that we identified in our previous memorandum opinion because it still: (a) precludes the application of proportionate responsibility; (b) rests on the same evidentiary record that we held was insufficient; and (c) fails to demonstrate that no lesser sanctions would suffice. The real parties assert, in contrast, that the trial court corrected all of the deficiencies regarding the imposition of sanctions that we addressed in our memorandum opinion and the second death penalty sanction was appropriate and necessary given the relators' transgressions.

We briefly review our holdings from the first death penalty sanction. First, the ruling "fail[ed] to comply with Texas Supreme Court precedent regarding the severity of the sanction imposed." *In re Sw. Pub. Serv. Co.*, 2020 WL 1887762, at *27. Second, "the trial court sanctioned relators for cumulative abuse of the judicial process," however, "a significant part of the alleged sanctionable conduct [could not] be attributed solely to

13

relators." *Id.* at *28. Third, it was not "fully apparent that no lesser sanctions would have suffced to promote relators' compliance with the rules." *Id.* at *29. Fourth, the trial court "refused to consider certain categories of evidence that [were] relevant to a determination regarding the imposition of sanctions." *Id.*

It is apparent that the trial court carefully considered our directives and worked to remedy the deficiencies in the first death penalty sanction. The trial court provided ample notice to the relators regarding its intent to consider the imposition of sanctions, convened an evidentiary hearing, rescheduled that hearing, allowed the relators to present witnesses, and expressly asserted that it considered the evidence presented in determining the propriety of sanctions. The trial court further allowed the relators to supplement the record with additional evidence after the hearing on sanctions had concluded. Despite these significant efforts, we agree with the relators that the trial court's second death penalty sanction fails to comport with our directives and is not supported by the governing law.

## A.    Sanctions Proceedings

As stated previously, the relators assert that the trial court abused its discretion in issuing death penalty sanctions for a second time based on the same events that we have already reviewed. We agree. There are several structural faults underlying the second death penalty sanction which are largely occasioned by the real parties' insistence that the problems that we identified in the first death penalty sanction could be remedied by, essentially, rephrasing the terms of the sanction order. In this regard, the seminal problem with the second death penalty sanction is that it is based almost entirely on the same conduct that we previously determined did not support the imposition of a case-

14

determinative sanction. The merits of this case were not substantively litigated during the period between the first and second death penalty order. After our memorandum opinion issued, the parties did not proceed with litigation, and the trial court did not issue lesser sanctions. Rather, the parties essentially relitigated the imposition of death penalty sanctions based on the same facts and law. The overwhelming majority of the trial court's seventy-five page second death penalty order concerns acts and omissions which formed the basis for the first death penalty order and which we previously addressed in our memorandum opinion. Nothing in the intervening span of time or in the record has altered our evaluation that death penalty sanctions were not warranted then and are not warranted now.

Further, the fact that the parties relitigated the imposition of sanctions created both recurrent and new problems with regard to the burden of proof. Based on trial court commentary and findings in the second death penalty sanction order, it is apparent that the trial court placed the burden on the relators to prove that they should not be sanctioned with a death penalty, again, rather than placing the burden on the real parties to establish their right to sanctions. *See GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993) (orig. proceeding) ("A party seeking sanctions has the burden of establishing his right to relief."). Moreover, the trial court repeatedly faulted the relators for failing to meet "their burden" to prove "scientific impossibility as a defense to sanctions." However, the relators did not have the burden to prove their claims on the merits in a sanction proceeding, just as they would not at trial. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 221 (Tex. 2019) ("[P]laintiffs have the burden of proof to establish their case by a preponderance of the evidence."). In our

15

previous memorandum opinion, we specifically explained that a determination on the merits is not required for an analysis of prejudice or sanctions where, as here, the sanction order is issued without the full development of the case. *See In re Sw. Pub. Serv. Co.*, 2020 WL 1887762, at *22–23.

The trial court's second death penalty sanction contains only a few paragraphs pertaining to the relators' actions after the first death penalty sanction. Specifically, the trial court concluded that sanctions were warranted because the relators served new expert disclosures "in contravention of the representations made . . . at multiple status conferences, and in contravention of their written witness and evidence scope communication . . . and without seeking leave of court." The trial court also noted that the relators supplemented discovery "with approximately 4[,]000 additional pages of new documents," "almost [three] years past the [court-ordered] deadlines to do so," "without any leave[,] explanation[,] or justification."

While the real parties and the trial court assert that discovery deadlines had passed, the relators assert otherwise. The record does not include an order closing discovery, and there is not a current trial setting.[6] Leaving these issues aside, sanctioning relators for supplementing their discovery responses under the circumstances present in this case is a problematic abuse of discretion. The rules of civil procedure impose

---

[6] Relators assert that their supplemental discovery responses were not late because the trial of this matter had been continued and a new trial date had not been set. However, this case has been litigated as a Level 3 discovery case, and the current rules do not measure timeliness by the date of trial. *See Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 882 (Tex. 2009) (per curiam) ("The former pretrial discovery rules established a fluid deadline for discovery disclosure, which could be modified based on a change in the date of trial," but "the new discovery rules establish a date certain for the completion of discovery, which depends on the discovery plan level and not on the trial date."); *see also* TEX. R. CIV. P. 190.4, 190.5.

16

affirmative duties on parties to supplement or amend their discovery responses when their responses were incomplete or incorrect when made or are no longer complete and correct. *See* TEX. R. CIV. P. 193.5; *In re Nat'l Lloyds Ins.*, 532 S.W.3d 794, 806 (Tex. 2017) (orig. proceeding). Here, the trial court convened an evidentiary hearing on sanctions, affirmatively asked the relators what evidence they intended to adduce and expected the relators to prove "scientific impossibility" at that hearing. For all practical intents and purposes, the trial court invited the relators to supplement their discovery responses. The trial court has effectively sanctioned the relators for not producing discovery, then sanctioned them for doing so. This is an untenable proposition. As succinctly observed by the Fourteenth Court of Appeals, "[t]he compliance, deterrence, and punishment rationales that undergird discovery sanctions are not promoted by a procedure that allows death penalty sanctions to be levied because the sanctioned litigant failed to cooperate after death penalty sanctions were levied," and "[r]e-hanging an already-hung litigant does not fix procedural flaws preceding the first trip to the gallows and does not comply with *TransAmerican*." *Primo v. Rothenberg*, No. 14-13-00794-CV, 2015 WL 3799763, at *23 (Tex. App.—Houston [14th Dist.] June 18, 2015, pet. denied) (mem. op.) (first citing *Chrysler*, 841 S.W.2d at 849, and then citing *TransAm. Nat. Gas Corp.*, 811 S.W.2d at 917–18).

We would similarly conclude that the trial court abused its discretion in assessing death penalty sanctions even if we were to consider relators' supplemental discovery responses as untimely.[7] Under Rule 193.6, when a party does not timely supplement

---

[7] Several courts have held that sanctions imposed for the late supplementation of discovery are not subject to a death penalty analysis. *See, e.g.*, *In re M.J.M.*, 406 S.W.3d 292, 299 (Tex. App.—San

discovery, that party may not introduce that discovery in evidence unless the court finds that there was good cause for the failure to timely supplement or the failure to timely supplement will not unfairly surprise or unfairly prejudice the other parties. TEX. R. CIV. P. 193.6. On this record, there is no indication that relators' supplemental discovery responses regarding the allegedly new guy wire theory resulted in unfair surprise or unfair prejudice to the real parties. In fact, in 2018, the trial court excluded testimony from relators' witnesses regarding relators' theory. By offer of proof, relators showed that their witnesses were prepared to testify that an overcurrent causing the powerline to sag would affect the entirety of the powerline, and if any grounded object, such as the guy wire, came into contact with the sagging powerline, "the system would have tripped . . . and prevented that accident." In this regard, the guy wire was plainly visible and apparent to the real parties' experts and investigators, and the guy wire was evident in photographs that relators produced to the real parties in 2018. Thus, the record does not show that relators' supplemental discovery responses caused either unfair surprise or prejudice. *See id.* And, in any event, even if the trial court were to have correctly determined otherwise, we note that the remedy for late production is exclusion of the evidence, not death penalty sanctions. *See id.*

## B.    Proportionate Responsibility

The relators argue that the second death penalty sanction constitutes an abuse of discretion because it precludes the application of the statutory rules regarding

---

Antonio 2013, orig. proceeding) ("The *TransAmerican* death penalty sanction analysis does not apply to evidence that is excluded pursuant to rule 193.6."); *see also Sheridan v. Haydon*, No. 03-22-00173-CV, 2023 WL 5488792, at *2 (Tex. App.—Austin Aug. 25, 2023, no pet. h.) (mem. op.); *Alphamar Grp. Inc. v. M&M Prot., LLC*, No. 14-20-00350-CV, 2022 WL 1463658, at *3 (Tex. App.—Houston [14th Dist.] May 10, 2022, no pet.) (mem. op.). We need not address this issue here.

18

proportionate responsibility. The real parties contend that issues pertaining to proportionate responsibility are no longer relevant because the relators' pleadings have been struck. We agree with relators.

In relevant part, the second death penalty sanction order provides that the relators are "jointly and severally liable for any judgment entered for [real parties'] compensatory damages, and no issues of proportionate liability of the [real parties], non-[relators], or other alleged responsible third parties shall be submitted to the finder of fact." The second death penalty sanction order states that "a full settlement credit for all settlement[s] received by [the real parties] shall be applied to the jury's verdict on the amount of [the real parties'] compensatory damages." This sanction is more severe than a death penalty.

The Texas Supreme Court has explained the proportionate responsibility provisions of the civil practice and remedies code as follows:

> Chapter 33 provides a framework for apportioning damages among tortfeasors responsible for "causing or contributing to cause in any way the harm for which recovery of damages is sought." The statute applies to deceptive-trade-practice actions, "any cause of action based on tort," and "any other conduct that violates an applicable legal standard." We have also applied Chapter 33 to statutory torts, but have declined to do so when the enabling statute contains a separate and conflicting fault-allocation scheme.
>
> By express carve-out, Chapter 33 is inapplicable to exemplary-damages claims, actions to collect workers' compensation benefits, and claims for damages arising from the manufacture of methamphetamine. [Texas Medicaid Fraud Prevention Act] actions are not expressly included in or exempted from Chapter 33.
>
> Chapter 33 embodies the fundamental tort-law principle that liability generally arises only from one's own injury-causing conduct and, as a result, liability for damages is commensurate with fault. Chapter 33's proportionate-responsibility scheme also incorporates the one-satisfaction rule–a tort concept that limits a plaintiff to only one recovery for any damages suffered because of an injury. This rule provides that when a

19

claimant seeks recovery for the same injury from multiple parties, the claimant is entitled to only one recovery on that injury.

Consistent with the one-satisfaction rule and legislative intent "to hold each person responsible for [the person's] own conduct causing injury," Chapter 33 requires the trier of fact to determine the percentage of responsibility of each claimant, defendant, settling person, and any responsible third party who has been designated in compliance with the statute. Damages are thereafter apportioned according to those comparative-fault findings.

*In re Xerox Corp.*, 555 S.W.3d 518, 523 (Tex. 2018) (orig. proceeding) (footnotes omitted). The civil practice and remedies code specifically states:

(a)     The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:

(1)     each claimant;

(2)     each defendant;

(3)     each settling person; and

(4)     each responsible third party who has been designated under [§] 33.004.

(b)     This section does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission.

TEX. CIV. PRAC. & REM. CODE ANN. § 33.003. If a claimant's responsibility exceeds fifty percent, the claimant is barred from recovering damages. *See id.* § 33.001. The amount of recoverable damages is reduced by the percentage of responsibility apportioned to the claimant and by all the amounts received in settlement. *See id.* § 33.012(a), (b). The civil

20

practice and remedies code limits the liability of a defendant whose responsibility does not exceed fifty percent to an amount equal to the percentage of responsibility allocated to that defendant. *See id.* § 33.013(a). Only when a defendant's responsibility exceeds fifty percent is it jointly and severally liable for the entire amount of the claimant's recoverable damages, minus the amount attributed to the claimant and all settlement proceeds. *See id.* § 33.013(b).

In this case, the trial court has granted summary judgment on the issue of the real parties' negligence. Given the nature of this proceeding, we express no opinion as to the merits of this ruling. Further, the relators have filed a motion to designate Sustayta as a responsible third party, and the trial court has not yet ruled on that motion. We likewise express no opinion as to the merits of that motion. However, the real parties settled their claims against Nelson and Wilco. The civil practice and remedies code requires the trier of fact to determine the percentage of responsibility for settling parties. *See id.* § 33.003. The trial court's second death penalty sanction order prevents this from happening. Without such a determination, the relators would be jointly and severally liable for all damages assessed by the jury, whether or not the jury finds them in excess of fifty percent responsible for the real parties' damages. The second death penalty sanction order thus fails to comply with the code. *See id.* §§ 33.003, 33.013(a), (b). Further, in effect, the trial court's ruling would operate as a windfall to the claimants if the jury were to find relators less than fifty percent responsible but awarded damages in excess of the relators' assessed responsibility. *See id.*; *Altesse Healthcare Sols., Inc.*, 540 S.W.3d at 572 (discussing a "death penalty" sanction which "made the plaintiffs better off than if they had succeeded on the merits of their claims").

21

## C. Summary

The trial court's second death penalty sanction order contains the same core findings and errors that we previously reviewed. We sustain the relators' first issue, with two of their subissues, and having done so, need not address the remaining part of the relators' first issue or the relators' second issue. *See* TEX. R. APP. P. 47.4.

In their third issue, the relators contend that they lack an adequate remedy by appeal to address the trial court's error. As with the first death penalty order, the second death penalty order precludes a decision on the merits of the real parties' claims, and thus a remedy by appeal is inadequate. *See TransAm. Nat. Gas Corp.*, 811 S.W.2d at 920. Allowing mandamus review will prevent wasting the time and money that would be spent on allowing a matter to proceed through a fatally flawed trial and a subsequent appeal. *See In re Essex Ins.*, 450 S.W.3d at 528. Considering the particular facts and circumstances of this case, we conclude that the relators lack an adequate remedy by appeal. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 136. We sustain the relators' third issue.

## V. CONCLUSION

The Court, having examined and fully considered the petition for writ of mandamus, the response, and the reply, is of the opinion that the relators have shown themselves entitled to mandamus relief. We previously concluded that the relators' conduct did not justify the presumption that their defenses lacked merit, and nothing has changed that evaluation. *See Paradigm Oil, Inc.*, 372 S.W.3d at 184; *Jurgens v. Martin*, 631 S.W.3d 385, 404 (Tex. App.—Eastland 2021, no pet.). In fact, relators' additional evidence strongly indicates that the missing data is cumulative of other competent evidence that

22

may be used in its stead. *See Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 489 (Tex. 2014). Further, we were not persuaded in 2020 that lesser sanctions would not suffice, and our decision then is supported by the current record. *See Petroleum Sols.*, 454 S.W.3d at 489; *Cire*, 134 S.W.3d at 841. Accordingly, we conditionally grant the petition for writ of mandamus, and we direct the trial court to withdraw its June 16, 2022 order granting death penalty sanctions and to conduct further proceedings in this case in accordance with this memorandum opinion. Our writ will issue only if the trial court fails to comply.

GINA M. BENAVIDES,
Justice

Delivered and filed on the
16th day of October, 2023.

23